IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Jonathon D. Monroe,

     Petitioner,

v.

                            Case No. 2:07-cv-258

Marc Houk, Warden,                       Judge Michael H. Watson

     Respondent.

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending

before this Court a habeas corpus action under 28 U.S.C. §2254. This matter is before

the Court upon respondent's motion to dismiss procedurally defaulted claims,

petitioner's memorandum in opposition, and respondent's reply.

### I. Factual History

The Supreme Court of Ohio set forth the facts and procedural history of this case

in *State v. Monroe*, 105 Ohio St. 3d 384 (2005):

> In the early morning of April 17, 1996, Travinna Simmons and
> Deccarla Quincy were murdered in Quincy's apartment on Columbus's
> east side. Four years later, the Cold Case Unit of the Columbus Police
> Homicide Department obtained evidence implicating Shannon Boyd and
> defendant-appellant, Jonathon Monroe, in the double homicide. Monroe
> was found guilty of murdering Simmons and Quincy and was sentenced to
> death. This is Monroe's appeal.
>
> In 1996, Shannon Boyd had known Monroe for a few years and
> had sold drugs with him. According to Boyd, on April 16, 1996, Monroe
> phone Boyd and asked him if he wanted "to take a ride." Monroe picked
> Boyd up and told him he had to meet someone on the east side of
> Columbus. They then drove to the Classic Lounge.
>
> Boyd later testified that inside the lounge, Monroe began talking to
> Deccarla Quincy and Travinna Simmons, whom Boyd described as

flirtatious. The women invited Boyd and Monroe to smoke marijuana with them, and they all agreed to meet at Quincy's apartment nearby. Federal authorities were watching Quincy's apartment because the women were reputed to be dealers in large quantities of drugs.

According to Boyd, he and Monroe got into Monroe's car, and Monroe told Boyd that he planned to smoke marijuana with the women and have them call their friends. He told Boyd that while Boyd stayed with the women, he would ride around with the women's friends, rob them, and then come back to get Boyd and act as if nothing had happened. But Boyd refused to go along with the plan, and when Monroe tried to give him a gun, Boyd refused that, too. Monroe shoved the gun under his driver's seat and told Boyd: "Quit being a pussy."

Monroe and Boyd exited the car and followed the women into Quincy's third-floor apartment. Boyd noticed that the cigars in Quincy's apartment were not the type he preferred for making marijuana cigars, so he went back to Monroe's car to retrieve his own cigars. When Boyd reentered Quincy's apartment, Simmons and Quincy were sitting on a couch, and Monroe was standing in front of them holding a gun. The gun was different from the one Monroe had showed Boyd earlier. Boyd told Monroe that he did not want to go along with what Monroe was doing. Monroe pointed the gun at Boyd and asked him, "Do you want to die?" When Boyd replied no, Monroe told him to shut the door and do what he said.

Boyd stated that Monroe gave him a pair of yellow latex dishwashing gloves to put on. Monroe then told Boyd to tape the woman's hands and ankles with clear packing tape that was on a table in the apartment. While Boyd taped the ankles and wrists of the woman he referred to as the "big girl" (Simmons), one of the glove's fingertips came off after getting stuck on the tape. When Boyd began taping the ankles of the "smaller girl" (Quincy), Monroe told Boyd he was doing it wrong and told him to get a knife from the kitchen. Monroe taped Quincy's ankles and then began asking the women where the drugs and money were. The women repeatedly denied having any. Monroe took the knife Boyd had brought from the kitchen and began poking the women with it, asking them where the drugs were. When the women denied having any drugs, Monroe stabbed them. Monroe then told Boyd to separate the women. Boyd grabbed Simmons and dragged her into a bedroom.

According to Boyd, Monroe put Simmons in a headlock while demanding drugs and money and stabbed her in the chest when she said that she and Quincy did not have any. Monroe put Simmons on a bed, then picked up Quincy from the couch and carried her into another

2

bedroom. Boyd then panicked and ran out of the apartment and down the outside stairwell.

Monroe later told a cellmate that after Boyd ran away, Monroe "went ahead and dumped them in the head," meaning that he shot both women in the head. Boyd heard gunshots when he was at the bottom of the stairwell. He then ran to a nearby gas station, where he called a cab.

Bennett and Patricia Wise lived in the apartment below Quincy's. Bennett was awakened by the scuffling and screaming coming from Quincy's apartment. Patricia, who was in the living room talking on the phone, also heard screaming and scuffling. She called 911. Patricia and Bennett heard someone running down the apartment-complex stairwell, and Bennett looked out from a window and saw a thin man wearing a greenish-yellow jacket running "real fast" from the apartment stairwell. Bennett recalled hearing "maybe four" gunshots. After the shots were fired, he saw a shorter, stocky, heavy man with a "mini-afro" run from the apartment stairwell with a gun in his hand. Other witnesses described Monroe as having been heavyset at the time of the murders.

Patricia also looked out the apartment window during the commotion. She first saw a young, tall, thin man run out wearing what she described as a "bright lined yellow jacket." Shots were still being fired in the apartment above when she saw the first man. After the first man fled the scene, Patricia saw a stocky black man come out of the stairwell. Patricia recalled that all the shots were fired from the apartment above. She estimated that seven or eight shots were fired.

Columbus Police arrived on the scene shortly thereafter and found the bodies of Simmons and Quincy. The apartment appeared to have been ransacked. Shell casings found in Quincy's apartment indicated that the women had been shot with a nine-millimeter firearm. Also found at the crime scene were pieces from a yellow rubber glove. Police collected blood from the front door of Quincy's apartment.

Although both women had suffered several sharp-instrument wounds, the coroner attributed Quincy's death to a gunshot wound to the head and Simmons's death to multiple gunshot wounds, including a fatal gunshot wound to her head.

The murders remained unsolved for several years. In January 2000, Detective Richard Bisutti of the Columbus Police Cold Case Unit was assigned the case. He had information that Monroe had been scheduled to make a drug transaction with one of the victims on the day of the homicides. The detectives began viewing Monroe as a suspect in the

slayings after blood samples they obtained from him matched the blood recovered from the crime scene.

During the fall of 2000, Boyd implicated Monroe in the murders and made a plea bargain with the prosecutor to plead guilty to two counts of involuntary manslaughter in exchange for his testimony against Monroe. Charles White, who shared a cell with Monroe in the county jail in November 2001, also implicated Monroe based on conversations he had with Monroe while they were incarcerated together.

Mark Hardy, a firearms examiner, concluded that the casings recovered at the scene, as well as bullets recovered from the two murder victims, were fired from a nine-millimeter firearm, likely a semiautomatic pistol. Hardy found that three different brands of ammunition were used in the slayings; however, no evidence suggested that more than one weapon was involved.

Lynn Bolin, a forensic scientist with the Bureau of Criminal Identification and Investigation ("BCI") specializing in DNA analysis, testified that blood found on the front door of Quincy's apartment was a mixture from various sources. The major DNA profile found in the mixture was consistent with Monroe's. Although the two victims could not be excluded as minor contributors to the mixture found on the apartment door, Boyd was excluded as a contributor. Bolin opined that Monroe could not be excluded as the source of the major DNA profile of the blood. The profile occurs in one in every 29.140 quadrillion in the Caucasian population, one in every 2.336 quadrillion in the African-American population, and one in every 1.538 quadrillion in the Hispanic population.

In April 2001, a grand jury indicted Monroe on eight counts of aggravated murder for the killings of Quincy and Simmons. Each count included a firearms specification and four death-penalty specifications: murder in connection with (1) an aggravated burglary, (2) an aggravated robbery, and (3) kidnapping (R.C. 2929.04[A][7]), and (4) murder as part of a course of conduct involving the killing of two persons (R.C. 2929.04[A][5]). Monroe was also indicted on one count of aggravated burglary, two counts of aggravated robbery, and two counts of kidnapping.

During a jury trial, the state presented a number of witnesses, including Boyd. Monroe presented three defense witnesses, including Boyd and White. Defense witness Nathaniel Gilmore, who had lived with Boyd after the murders, testified that Boyd had told him that he murdered the two women and had never mentioned that anyone was with him. White testified that when he and Boyd were in jail, Boyd told him that he and Monroe had stabbed and shot the two victims. When another inmate

expressed disbelief that Boyd could ever stab or shoot anyone, Boyd revised his story and said that Monroe was the one who had stabbed and shot the two women. When called by the defense, Boyd denied ever having talked to Gilmore about the murders and denied telling White that he had stabbed the victims. The trial court gave a limiting instruction to the jury that the testimony by Gilmore and White regarding what Boyd had told them was admitted solely to test the credibility of Boyd and was not to be considered for any other purpose.

After deliberation, the jury found Monroe guilty as charged. At the conclusion of the penalty phase, the jury recommended death, and the trial court imposed the death sentence.

*Monroe*, 105 Ohio St. 3d at 384-87; App. Vol. 4, at 288-294.

## II. State Court History

### A. Direct Appeal

Represented by attorneys W. Joseph Edwards and Todd W. Barstow--petitioner

had been represented at trial by attorneys Brian Rigg and Ronald Janes--petitioner

appealed his conviction and death sentence directly to the Supreme Court of Ohio. In a

merit brief filed on July 21, 2003, he raised the following propositions of law:

Proposition of Law One: The Appellant was denied effective assistance of counsel, thereby depriving him of a fair trial as required by the Sixth Amendment to the United States Constitution and Article One, Section Ten of the Ohio Constitution.

Proposition of Law Two: The trial court erred to the prejudice of Appellant by admitting gruesome and repetitive crime scene photographs in contravention of Appellant's right to a fair trial and a fair sentencing determination as guaranteed by the Sixth Amendment to the United States Constitution and Article One, Section Ten of the Ohio Constitution.

Proposition of Law Three: The trial court abused its discretion and erred to the prejudice of the Appellant by refusing to instruct the jury on the lesser included offenses of murder and manslaughter, thereby depriving Appellant of a fair trial and due process of law as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article One, Section Ten of the Ohio Constitution.

Proposition of Law Four: The verdicts in this case were not supported by sufficient evidence and were against the manifest weight of the evidence, thereby denying Appellant due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article One, Section Ten of the Ohio Constitution.

Proposition of Law Five: The Appellant was denied effective assistance of counsel, thereby depriving him of a fair trial and a fair sentencing determination as required by the Sixth Amendment to the United States Constitution and Article One, Section Ten of the Ohio Constitution.

Proposition of Law Six: Imposition of the death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article One, Sections Two, Nine and Sixteen of the Ohio Constitution.

Proposition of Law Seven: The trial court's failure to determine whether Appellant was competent to waive mitigation and whether said waiver was done knowingly and voluntarily violated Appellant's rights under the United States and Ohio Constitutions.

Proposition of Law Eight: In a capital trial it is error to admit in the penalty phase evidence of numerous gruesome photographs not relevant to the sentencing decision.

Proposition of Law Nine: A jury instruction that requires that a life sentence recommendation be unanimous materially prejudices a capital defendant's right to a fair trial and to be free from deprivation of life without due process of law under the Fourteenth Amendment to the United States Constitution.

Proposition of Law Ten: By using the word recommendation throughout the voir dire and penalty phase instructions, the trial court deprived Appellant of his right to a fair trial under the United States and Ohio Constitutions.

Proposition of Law Eleven: Multiple instances of deficient performance in the conduct of the penalty phase of a capital trial coupled with prejudice inuring to the detriment of the appellant result in the denial of the right to a fair trial and the right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution.

Proposition of Law Twelve: The trial court violated Appellant's constitutional rights by failing to merge duplicative aggravating circumstances for purposes of the penalty phase weighing process.

Proposition of Law Thirteen: A death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution when the jury was not presented with all relevant mitigating evidence.

On May 25, 2005, the Ohio Supreme Court issued a decision rejecting petitioner's propositions of law and affirming the judgment against him.

B. Application for Reopening Pursuant to S. Ct. R. Prac. XI, 5

On November 1, 2005, petitioner filed in the Ohio Supreme Court a motion for appointment of counsel to file an application to reopen his appeal for the purpose of raising claims of ineffective assistance of appellate counsel. On December 14, 2005, the Ohio Supreme Court granted petitioner's motion and appointed attorney David C. Stebbins. Represented by Mr. Stebbins, on January 17, 2006, petitioner filed an application for reopening of his direct appeal to the Ohio Supreme Court pursuant to S. Ct. R. Prac. XI, 5--the procedure in Ohio for raising claims of ineffective assistance of appellate counsel. Petitioner argued that his appellate attorneys had performed deficiently and to his prejudice in failing to raise the following propositions of law:

Proposition of Law One: Jonathon Monroe was deprived of the effective assistance of counsel during pretrial investigation and motion practice as well as during the trial and penalty phases under Art. I, §§ 2, 9, 10, and 16 of the Ohio Constitution as well as the 5th, 6th, 8th and 14th amendments.

Proposition of Law Two: Jonathon Monroe was deprived of the effective assistance of counsel at the penalty phase by counsel's failure to properly investigate and prepare for the penalty phase and by counsel's deficient performance during the penalty phase under Art. I, §§ 2, 9, 10, and 16 of the Ohio Constitution, as well as the 5th, 6th, 8th and 14th amendments.

Proposition of Law Three: Jonathon Monroe's sentence of death was obtained in violation of Art. I, Sec. 2, 9, 10 and 16 of the Ohio Constitution, the 5th, 6th, 8th, and 14th amendments, as well as the various treaty and compact obligations of the United States under international law.

7

Proposition of Law Four: The prosecutor failed to provide Monroe with material exculpatory evidence prior to trial.

Proposition of Law Five: Ohio has failed to provide an adequate system of appellate and proportionality review in death penalty cases.

Proposition of Law Six: Jonathon Monroe's sentence of death is disproportionate and inappropriate in this case.

Proposition of Law Seven: The prosecutor appealed to the passions and prejudices of the jury.

On May 10, 2006, the Ohio Supreme Court issued an entry summarily denying

petitioner's application for reopening. (App. Vol. 5, at 161.)

## C. Postconviction Proceedings

While still pursuing his direct appeal of right from the judgment against him,

petitioner filed on September 26, 2003 a petition for postconviction relief in the trial

court. Represented by attorney David Stebbins, petitioner raised the following claims

for relief:

First Ground for Relief: Counsel failed to thoroughly investigate Jonathon Monroe's background and mental health history and therefore failed to discover and present compelling mitigating evidence at the penalty phase.

Second Ground for Relief: Jonathon Monroe was not fully informed about the scope of the penalty phase or the existence of compelling mitigating evidence. His decision to waive the presentation of compelling mitigating evidence was uninformed and therefore not voluntary or knowing.

Third Ground for Relief: Jonathon Monroe was denied due process, a fair trial, and the effective assistance of counsel by the trial court's unreasonable restrictions on the appropriation of funds for investigation, for mental health specialists, and for payment of counsel.

Fourth Ground for Relief: The limited presentation at the penalty phase did not convey to the jury the compelling mitigating evidence that could have convinced the jury to impose a life sentence.

8

Fifth Ground for Relief: Counsel's acquiescence in Jonathon Monroe's abandonment of the presentation of compelling mitigating evidence without raising his competence to make [sic] waive mitigation was unreasonable.

Sixth Ground for Relief: Introduction of gruesome trial phase photographs at the penalty phase.

Seventh Ground for Relief: The trial [court] failed to merge the eight counts of aggravated murder when there were only two deaths and failed to merge the duplicative aggravating circumstances.

Eighth Ground for Relief: The prosecutor failed to provide Monroe with material exculpatory evidence prior to trial.

Ninth Ground for Relief: Ohio has failed to provide an adequate system of appellate and proportionality review in death penalty cases.

Tenth Ground for Relief: Jonathon Monroe's sentence of death is disproportionate and inappropriate in this case.

Eleventh Ground for Relief: Counsel's failure to employ and present a cultural expert.

Twelfth Ground for Relief: Pretrial motion practice fell below the prevailing professional norms and deprived Monroe of the effective assistance of counsel.

Thirteenth Ground for Relief: The prosecutor appealed to the passions and prejudices of the jury.

Fourteenth Ground for Relief: Ohio's statutory scheme for the imposition of the death penalty violates Article I, §§ 2, 9, 10, and 16 of the Ohio Constitution as well as the Fifth, Sixth, Eighth, and Fourteenth Amendments.

   A)    It constitutes cruel and unusual punishment;

   B)    Unbridled prosecutorial discretion in charging decisions results in arbitrary and capricious application;

   C)    Premeditation or deliberation is not required as a culpable mental state in all cases;

D)    The fact-finder's discretion is unguided in that it is not provided with a standard of proof by which to judge mitigating factors;

E)    The fact-finder's discretion is unguided in that it is not provided with a standard with which to balance mitigating factors against aggravating circumstances;

F)    The fact-finder is required to consider aggravating circumstances during the culpability phase of the trial, thus thwarting the rationale behind bifurcation;

G)    Felony murderers are treated more harshly than premeditated murderers;

H)    Sentencers are not allowed to bestow mercy or impose a life sentence if the aggravating circumstances outweigh the mitigating factors;

I)    Use of the same jury at both the culpability and sentencing phases of trial deprives defendants of an impartial jury and effective assistance of counsel;

J)    Due to Ohio R. Crim. P. 11(C)(3), defendants are encouraged to waive their fundamental rights and enter guilty pleas;

K)    Ohio employs a mandatory death penalty;

L)    Sentencing discretion has been eliminated;

M)    A jury is required to recommend death if it finds that the aggravating circumstances outweigh the mitigating factors; and

N)    It infringes upon a fundamental liberty interest, namely life, without requiring the State to first demonstrate that it has a compelling interest in executing prisoners, and that executions are the least restrictive means available to accomplish these objectives.

O)    Adequate appellate and proportionality review is not provided for.

P)    Ohio does not provide an adequate system of post conviction review to permit Monroe to fully and fairly present

his claims of constitutional deprivations to the state courts, thus denying him due process.

Fifteenth Ground for Relief: Jonathon Monroe's sentence of death was obtained in violation of Art. I, Sec. 2, 9, 10, and 16 of the Ohio Constitution. The Fifth, Sixth, Eighth, and Fourteenth Amendments as well as the various treaty and compact obligations of the United States under international law.

Sixteenth Ground for Relief: Jonathon Monroe was denied due process, a fair trial, and the effective assistance of counsel during the jury selection process, including voir dire.

A)    The court ignoring the clear statutory mandate of Ohio Revised Code 2945.25(C) concerning the standards for excusing jurors who expressed some scruples about the death penalty in favor of the less stringent standards enunciated by the Supreme Court of the United States in *Wainwright v. Witt* 469 U.S. 412 (1985). The lesser standard of *Witt* permitted jurors to be excluded who otherwise would not have been excused R.C. 2945.25(C). Monroe was denied the effective assistance of counsel by counsel's failure to object.

B)    The court denying Monroe's request for comprehensive, individual sequestered voir dire and forcing counsel to conduct sequestered voir dire to issues on the death penalty in groups of six rather than individually. Counsel was ineffective for failing to object.

C)    By counsel's failure to examine jurors on general theories of defense and mitigation and questioning prospective jurors as to their ability to consider either such defenses or mitigation. In many instances, trial counsel asked the panels of six jurors no questions at all. Counsel merely made a speech about the case without inquiring in any way into the jurors' feelings or their ability to fairly participate in the trial of this case.

D)    By counsel's failure to rehabilitate persons with scruples against the death penalty and by counsel's failure to object to the state's questions about whether they would be criticized by friends or family for failing to return a death penalty verdict.

E) The combined effect of counsel's failure to prepare and failure to elicit information to permit them to make informed and reasoned decisions concerning challenges for cause as well as peremptory challenges fell below the standards of practice for competent counsel in capital cases, and deprived Jonathon Monroe a fair trial, due process, and the effective assistance of counsel.

Seventeenth Ground for Relief: Jonathon Monroe was deprived of a fair trial, due process, and the effective assistance of counsel at the pre-trial and trial phases.

A) Jonathon Monroe was denied a fair trial, due process, and the effective assistance of counsel by counsel's failure to meet the standards for representation expected of competent counsel in a capital case in 2002. Jonathon Monroe was prejudiced by counsel's failure to provide competent representation by being convicted of aggravated murder when he did not commit the crime and when the state failed to present sufficient evidence to sustain a conviction of the crimes.

B) Counsel failed to adequately investigate and prepare for the case, demonstrating a lack of familiarity with the facts of the state's case and the facts of the defense case and how either of these related to any theory of mitigation.

C) Counsel failed to develop and present an effective theory of defense or to suggest and present an effective theory of mitigation at the trial phase of the case.

D) Monroe wanted to present an alibi defense at the trial phase of the case. Individual members of his family (mother, sister, and younger brother) could have demonstrated that I was not at the scene of the crime and could not have committed these murders. At the time Monroe lived with his mother and younger brother. These family members were willing and able to testify as to my whereabouts on the day of these murders.

E) The attorneys interviewed these family members and told them that they could not be in the courtroom because they were going to be witnesses at the trial phase. Monroe's sister and younger brother were never contemplated as witnesses for the penalty phase. Because they were

excluded from the courtroom, Monroe was alone in the courtroom throughout the trial without any support from his family, a factor that prejudiced him with the jury.

F)    Without discussing the issue with Monroe, counsel informed the judge that Monroe's family did not want to testify and that they were ready for closing argument without putting the family on to testify as to his alibi.

G)    Counsel did not let Monroe explain these matters to the judge on the record.  The judge refused to listen to Monroe and simply agreed with the attorney's decision not to present his family as witnesses.

H)    Monroe's family were all willing and ready to testify.

I)    The state also presented Chuck White as a witness. Chuck White was a snitch who testified about Monroe telling him about his participation in the crime.  Counsel knew that Chuck White had previously celled with co-defendant Shannon Boyd.  They did not investigate this.  Counsel did not adequately cross-examine Chuck White on any of these matters, especially that Shannon Boyd had told Chuck White that he (Shannon Boyd) had committed these crimes not that Jonathon Monroe had committed them.

J)    Chuck White took the information that he had received from his friend Shannon Boyd and turned it around and testified that Monroe had told him that Monroe had committed these crimes and that Shannon Boyd had been an innocent bystander who ran away.  Chuck White and Shannon Boyd had been friends prior to this time.  Monroe had never met Chuck White prior to this time.  Chuck White testified that he had known Monroe for six years.  Counsel failed to demonstrate that this was not true and that they had never met until they were celled together.

K)    Counsel failed to investigate and/or present evidence in the form of letters from Shannon Boyd addressed to Jonathon Monroe me [sic] in which there were admissions about Boyd's participation in the crime and in which he requested Monroe to take the fall for this crime.

L)    Throughout the trial, Monroe asked counsel to question witnesses on specific subjects.  Counsel repeatedly refused

to question or cross-examine witnesses about information that Monroe had given them. (Tr. pp. 736, 739, 748, 751, 1040, 1117)

M)    Counsel failed to investigate and fully cross-examine the state's witnesses. As a result clearly available evidence demonstrating Monroe's innocence was not presented to the jury.

N)    Counsel did not explain to Monroe what was going on at the trial. Monroe had discussed with them and expected them to put on a defense. Monroe also expected that he would testify at the trial phase. Counsel abruptly in the middle of the trial told him that they were going to close. They called Monroe a liar and told him that his family did not believe him and would not tell the same story as he would have. Therefore, counsel put on no evidence of the alibi.

O)    Monroe objected to counsel's failure to present his family to testify as witnesses at the trial phase ad their decision to simply proceed with closing argument without presenting this defense. Monroe attempted to tell the judge that his attorneys had lied and deceived him throughout the trial about having his family testify; and that they never told him the were going to close until they stood up and announced that they were resting. The judge ignored Monroe and let counsels explain their actions and proceed with closing arguments without presenting any alibi witnesses or permitting Monroe to testify. (See Affidavit of Jonathon Monroe attached as Exhibit A)

P)    Counsel failed to obtain and present exculpatory evidence in the possession of the state. Counsel failed to obtain evidence that other persons committed the crime and that law enforcement agencies possessed exculpatory and mitigating evidence.

Q)    Because of the failures of counsel, Monroe was denied a fair trial, due process, and effective assistance of counsel and was convicted of a crime of which he was innocent and which the state failed to prove he committed by constitutionally sufficient evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as Article I, Section 2, 9, 10, and 16 of the Ohio Constitution, Jackson v. Virginia, 443 U.S. 307 (1979).

R)     To the extent that these failures of counsel to effectively and competently represent Jonathon Monroe appear in the record and may have been raised on direct appeal (and were not addressed on appeal) Monroe was denied the effective assistance of counsel on appeal as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article I, Section 2, 9, 10, and 16 of the Ohio Constitution.  Evitts v. Lucey, 409 U.S. 387 (1985).

S)     Jonathon Monroe was denied due process, a fair trial, and the effective assistance of counsel by trial counsel's failure to investigate, prepare, and present Jonathon Monroe's life history and psychological background to understand and present a viable and comprehensive theory of mitigation to the jury during the penalty phase of Monroe's trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution.

T)     Counsel was unable to fully conduct an investigation into the psychological history of Jonathan Monroe because of the trial court's unreasonable and arbitrary refusal to appropriate sufficient funds for counsel to employ the necessary mitigation specialists, mental health experts, and cultural experts to assist in the investigation and preparation of mitigation.  The court's failure to provide for reasonable and necessary expert assistance prevented counsel from obtaining the expert advice on the preparation of mitigation that is critical to the preparation and presentation of mitigating factors at the penalty phase.  This denial affected counsel's performance throughout the preparation for and presentation of both the trial phase and the penalty phase, thus preventing counsel from obtaining necessary information and expertise with which to make informed reasoned decisions about mitigation to be presented and/or withheld.

U)     To the extent that counsel failed to present sufficient factual and legal argument to demonstrate the reasonable necessity of the court providing sufficient funds for a mitigation specialist, mental health experts, and cultural experts, Monroe was further denied the effective assistance of counsel.  The standard of practice for competent counsel in capital cases in 2002 required counsel to present sufficient evidence and legal argument to convince the court

to provide funds for a mitigation specialist and experienced forensic psychologist. (See Affidavit of Donald Schumaker, Esq. attached as Exhibit C)

V) To the extent they failed to fully object, counsel's failure to object to the admission at the penalty phase of *all* of the evidence and exhibits from the trial phase. The sole question at the penalty phase for the jury is whether the state has proven, beyond a reasonable doubt, that the statutory aggravating circumstance that Monroe had been convicted of outweighed the mitigating circumstances presented. Ohio Rev. Code §§ 2929.03(D). Permitting the jury to consider all of the evidence and exhibits from the trial is clearly irrelevant to the sole question at the penalty phase and his highly inflammatory. (See Affidavit of Donald Schumaker, Esq., Exhibit C)

W) Counsel failed to prepare Jonathon Monroe to give an unsworn statement. Monroe's unsworn statement was brief and did not explain anything to jury. (See Affidavit of Jonathon Monroe, attached as Exhibit A)

Eighteenth Ground for Relief: Ohio provides an inadequate post-conviction remedy to permit Monroe to fully and fairly vindicate his federal constitutional claims.

On June 1, 2004, the state trial court issued a decision rejecting petitioner's

postconviction action. (App. Vol. 6, at 327.)

Petitioner appealed to the Court of Appeals for the Tenth Appellate District, and

in a merit brief filed on August 23, 2004, raised the following propositions of law:

Assignment of Error No. I: The trial court erred in denying Jonathon Monroe's claims that he was denied the effective assistance of counsel at the penalty phase in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments as well as Art. I, §§ 2, 9, 10, and 16 of the Ohio Constitution.

Assignment of Error No. II: Introduction of gruesome trial phase photographs at the penalty phase deprived Jonathon Monroe of due process and a fair and reliable sentencing determination.

Assignment of Error No. III: The trial court failed to merge the eight counts of aggravated murder when there were only two deaths and failed to merge the duplicative aggravating circumstances, thus denying Jonathon Monroe a fair and reliable sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments as well as Art. I, Sec. 2, 9, 10, and 16 of the Ohio Constitution.

Assignment of Error No. IV: The prosecutor failed to provide Monroe with material exculpatory and mitigating evidence prior to trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and Art. I, Sec. 2, 9, 10, and 16 of the Ohio Constitution.

Assignment of Error No. V: Ohio has failed to provide an adequate system of appellate and proportionality review in death penalty cases. Monroe's sentence is disproportionate and inappropriate.

Assignment of Error No. VI: Counsel failed to obtain expert assistance to enable them to explain the devastating effects of Monroe's impoverished background, denying Monroe the effective assistance of counsel, due process, and a fair sentencing determination.

Assignment of Error No. VII: Ohio's statutory scheme for the imposition of the death penalty violates Article I, §§ 2, 9, 10, and 16 of the Ohio Constitution, the Fifth, Sixth, Eighth, and Fourteenth Amendments, and the various treaty and compact obligations of the United States under international law.

Assignment of Error No. VIII: Jonathon Monroe was denied due process, a fair trial, and the effective assistance of counsel during the jury selection process, including voir dire; during the pre-trial and motion practice phase; and during the trial and penalty phases.

Assignment of Error No. IX: Ohio provides an inadequate post-conviction remedy to permit Monroe to fully and fairly vindicate his federal constitutional claims under the Fifth, Sixth, Eighth, and Fourteenth Amendments and Art. I, §§ 2, 9, 10, and 16 of the Ohio Constitution.

Assignment of Error No. X: The trial court's actions in failing to rule on Monroe's requests for expert and investigative assistance denied Monroe a full and fair opportunity to litigate his constitutional claims in post conviction under the Fifth, Sixth, Eighth, and Fourteenth Amendments as well as Art. I, Sec. 2, 9, 10, and 16 of the Ohio Constitution.

Petitioner filed a corrected brief on October 14, 2004, following an October 1, 2004 order by the appellate court advising him that his original brief was non-compliant because the assignments of error did not include page references to the record. On September 30, 2005, the appellate court issued an opinion rejecting petitioner's assignments of error and affirming the judgment of the trial court dismissing his postconviction action. (App. Vol. 8, at 195.) Judge Bryant concurred in part and dissented in part, writing separately to advise that she would have "sustain[ed] defendant's assignment of error that asserts the trial court erred in failing to conduct a hearing on the advice defense counsel gave defendant regarding the nature and purpose of the mitigation phase of his trial," (App. Vol. 8, at 221), and that she also would have had "the trial court examine defendant's contentions he possessed a letter from Shannon Boyd that admitted defendant's lesser role in the crimes for which defendant was tried" (Id., at 222).

Petitioner appealed the appellate court's decision to the Supreme Court of Ohio, filing a memorandum in support of jurisdiction on November 7, 2005 that raised the following propositions of law:

> Proposition of Law I: Under Ohio Rev. Code § 2953.21, where a defendant in a capital case submits evidence dehors the record sufficient to demonstrate that his conviction and/or sentence are void or voidable under the United States or Ohio Constitution, the trial court must grant the petition, or permit discovery and an evidentiary hearing to further develop the factual bases for the constitutional claim.
>
> A. Ineffective Assistance of Counsel at the Penalty Phase.
>
> B. Jonathon Monroe's attempt to waive the presentation of mitigating evidence was uninformed and therefore not voluntary or knowing.

18

C. The trial court placed unreasonable restrictions on the appropriation of funds for investigation, for a mitigation specialist, for mental health specialists, and for payment of counsel.

D. The limited presentation at the penalty phase did not convey to the jury the compelling mitigating evidence that could have convinced the jury to impose a life sentence.

E. Counsel's acquiescence in Jonathon Monroe's request to abandon mitigation without fully explaining the purposes of mitigation and without raising his competence to waive mitigation was unreasonable.

Proposition of Law II: Counsel's failure to obtain expert assistance to enable them to explain the devastating effects of Monroe's impoverished background, fell far below the prevailing professional norms for counsel in a capital case.

Proposition of Law III: The failure of counsel to perform within the prevailing professional norms during the jury selection process, including voir dire; during the pre-trial and motion practice phase; and during the trial and penalty phases, denied Monroe the effective assistance of counsel.

Proposition of Law IV: Introduction of gruesome trial phase photographs at the penalty phase deprived Jonathon Monroe of due process and a fair and reliable sentencing determination.

Proposition of Law V: Permitting the jury to consider eight counts of aggravated murder and thirty two statutory aggravating circumstances where only two people were killed created a mandatory death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments as well as Art. I, Sec. 2, 9, 10, and 16 of the Ohio Constitution.

Proposition of Law VI: The prosecutor failed to provide Monroe with material exculpatory and mitigating evidence prior to trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and Art. I, Sec. 2, 9, 10, and 16 of the Ohio Constitution.

Proposition of Law VII: Ohio has failed to provide an adequate system of appellate and proportionality review in death penalty cases. Monroe's sentence is disproportionate and inappropriate.

<u>Proposition of Law VIII</u>: Ohio Rev. Code § 2953.21 *et seq*. does not permit death sentenced inmates to fully and fairly vindicate their federal constitutional claims under the Fifth, Sixth, Eighth, and Fourteenth Amendments and Art. I, § 2, 9, 10, and 16 of the Ohio Constitution.

<u>Proposition of Law IX</u>: Under Ohio Rev. Code § 2953.21 and § 2929.024, where a defendant in a capital case submits evidence *dehors* the record sufficient to demonstrate that his conviction or sentence may be void or voidable under the United States or Ohio Constitution, due process requires that the defendant be provided reasonable and necessary expert and investigative assistance to develop the factual bases for his constitutional claims to present at an evidentiary hearing.

<u>Proposition of Law X</u>: Ohio's statutory scheme for the imposition of the death penalty violates Article I, §§ 2, 9, 10, and 16 of the Ohio Constitution, the Fifth, Sixth, Eighth, and Fourteenth Amendments, and the various treaty and compact obligations of the United States under international law.

     A)    It constitutes cruel and unusual punishment;

     B)    Unbridled prosecutorial discretion in charging decisions results in arbitrary and capricious application;

     C)    Premeditation and deliberation is not required as a culpable mental state in all cases;

     D)    The fact-finder's discretion is unguided in that it is not provided with a standard of proof by which to judge mitigating factors;

     E)    The fact-finder's discretion is unguided in that it is not provided with a standard with which to balance mitigating factors against aggravating circumstances;

     F)    The fact-finder is required to consider aggravating circumstances during the culpability phase of the trial, thus thwarting the rationale behind bifurcation;

     G)    Felony murderers are treated more harshly than premeditated murderers;

     H)    Sentencers are not permitted to bestow mercy or impose a life sentence if the aggravating circumstances outweigh the mitigating factors;

I) Use of the same jury at both the culpability and sentencing phases of trial deprives defendants of an impartial jury and effective assistance of counsel;

J) Due to Ohio R. Crim. P. 11(C)(3), defendants are encouraged to waive their fundamental rights and enter guilty pleas;

K) Ohio employs a mandatory death penalty;

L) Sentencing discretion has been eliminated;

M) A jury is required to recommend death if it finds that the aggravating circumstances outweigh the mitigating factors; and

N) It infringes upon a fundamental liberty interest, namely life, without requiring the State to first demonstrate that it has a compelling interest in executing prisoners, and that executions are the least restrictive means available to accomplish these objectives.

O) Adequate appellate and proportionality review is not provided for.

P) Ohio does not provide an adequate system of post conviction review to permit Monroe to fully and fairly present his claims of constitutional deprivations to the state courts, thus denying him due process.

On March 29, 2006, the Ohio Supreme Court issued an entry summarily declining to accept jurisdiction over petitioner's appeal. (App. Vol. 9, at 134.)

III. Habeas Corpus Petition

Petitioner informally initiated these proceedings on February 12, 2007 by filing a notice of intent to file a habeas corpus petition, a motion to proceed *in forma pauperis*, a motion for appointment of counsel. (Doc. #'s 1 and 2.) The Court issued a March 21, 2007 order granting those motions. (Doc. # 6.) These proceedings were formally

21

initiated on March 27, 2007 when the habeas corpus petition (Doc. # 10) was filed

raising the following claims for relief:

**First Ground for Relief:** Jonathon Monroe was deprived of due process and a fair trial by the ongoing misconduct of the prosecuting attorney in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Second Ground for Relief:** Jonathon Monroe was deprived of a fair trial and due process by the trial court's failure to instruct the jury on the lesser included offenses of murder and manslaughter in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Third Ground for Relief:** The verdict(s) of guilty of aggravated murder with prior calculation and design were not supported by sufficient evidence denying Monroe due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Fourth Ground for Relief:** The introduction of gruesome photographs at both the trial and penalty phases deprived Monroe of due process, a fundamentally fair trial, and a fair and reliable sentencing procedure, under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Fifth Ground for Relief:** The State's failure to provide Monroe with material exculpatory evidence prior to trial denied him due process and a fundamentally fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Sixth Ground for Relief:** The failure of the trial court to merge the eight counts of aggravated murder and the failure of the trial court to merge the duplicative aggravating circumstances when there were only two deaths denied Monroe due process, a fair trial, and a fair and reliable sentencing determination by overwhelming the weighing process at the penalty phase, under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Seventh Ground for Relief:** The jury instructions and verdict forms required the jury to unanimously reject a death sentence before considering any of the life sentence options, depriving Monroe of a fair trial, due process, and a fair and reliable sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Eighth Ground for Relief:** Trial counsel's performance throughout the trial preparation, the voir dire, the pre-trial process and throughout the trial

fell far below the prevailing professional norms, thus depriving Monroe of the effective assistance of counsel.

**A.** Monroe was denied due process, a fair trial, and the effective assistance of counsel during the jury selection process, including voir dire.

¶ 182 (A) The trial court ignored the clear statutory mandate of Ohio Revised Code 2945.25(C) concerning the standards for excusing jurors who expressed some scruples about the death penalty in favor of the less stringent standards enunciated by the Supreme Court of the United States in *Wainwright v. Witt* 469 U.S. 412 (1985). The lesser standard of *Witt* permitted jurors to be excluded who otherwise would not have been excused under Ohio Rev. Code § 2945.25(C). Monroe was prejudiced and thereby denied the effective assistance of counsel by counsel's failure to object.

¶ 182 (B) The court denied Monroe's request for comprehensive, individual sequestered voir dire and forced counsel to conduct sequestered voir dire on issues concerning the death penalty in groups of six rather than individually. Monroe was prejudiced and thereby denied the effective assistance of counsel by counsel's failure to object.

¶ 182 (C) Counsel failed to examine jurors on general theories of defense and mitigation or question prospective jurors on their ability to consider either defenses or mitigation. In many instances, trial counsel asked the panels of six jurors **no questions** at all. Counsel merely made a speech about the case without inquiring in any way into the jurors' feelings or their ability to fairly participate in the trial of this case.

¶ 182 (D) Counsel failed to rehabilitate potential jurors with scruples against the death penalty; counsel failed to object to the state's questions about whether they would be criticized by friends or family for failing to return a death penalty verdict.

¶ 182 (E) The combined effect of counsel's failure to prepare and failure to elicit information from potential jurors so as to permit counsel to make informed and reasoned decisions concerning challenges for cause as well as

peremptory challenges fell below the prevailing professional norms for counsel in capital cases in 2002, and deprived Jonathon Monroe of a fair trial, due process, and the effective assistance of counsel.

**B.** Jonathon Monroe was deprived of a fair trial, due process, and the effective assistance of counsel at the pre-trial and trial phases, including pretrial motion practice which fell below the prevailing professional norms and deprived Monroe of the effective assistance of counsel.

**Ninth Ground for Relief:** Counsel's performance at and in preparing for the penalty phase of Monroe's capital trial fell far below the prevailing professional norms, and deprived Monroe of the effective assistance of counsel at the penalty phase in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**A.** Counsel failed to thoroughly investigate Jonathon Monroe's background and mental health history and therefore failed to discover and present compelling mitigating evidence at the penalty phase.

**B.** Jonathon Monroe was not fully informed about the scope of the penalty phase or the existence of compelling mitigating evidence. His decision to waive the presentation of compelling mitigating evidence was uninformed and therefore not voluntary or knowing under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**C.** Jonathon Monroe was denied due process, a fair trial, and the effective assistance of counsel by the trial court's unreasonable restrictions on the appropriation of funds for investigation, for a mitigating specialist, for mental health specialists, and for payment of counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**D.** The limited presentation at the penalty phase did not convey to the jury the compelling mitigating evidence that could have convinced the jury to impose a life sentence.

**E.** Counsel's failure to challenge Monroe's attempt to limit the presentation of compelling mitigating evidence without raising his competence was unreasonable under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

F.    Counsel's failure to employ and present a cultural expert or other mental health expert who could explain the effects of Monroe's diverse and bizarre behavior on his development, depriving Monroe of the effective assistance of counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Tenth Ground for Relief:** Monroe was denied the effective assistance of appellate counsel on his sole appeal of right to the Supreme Court of Ohio in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

¶ 389)    Jonathon Monroe was deprived of the effective assistance of counsel during pretrial investigation and motion practice as well as during the trial and penalty phases under Art. I, §§ 2, 9, 10, and 16 of the Ohio Constitution as well as the 5th, 6th, 8th, and 14th Amendments.

¶ 395)    Jonathon Monroe was deprived of the effective assistance of counsel at the penalty phase by counsel's failure to properly investigate and prepare for the penalty phase and by counsel's deficient performance during the penalty phase under Art. I, §§ 2, 9, 10, and 16 of the Ohio Constitution, as well as the 5th, 6th, 8th, and 14th Amendments.

¶ 406)    Jonathon Monroe's sentence of death was obtained in violation of Art. I, Sec. 2, 9, 10, and 16 of the Ohio Constitution.  The 5th, 6th, 8th, and 14th Amendments as well as the various treaty and compact obligations of the United States under international law.

¶ 409)    The prosecutor failed to provide Monroe with material exculpatory evidence prior to trial.

¶ 411)    Ohio has failed to provide an adequate system of appellate and proportionality review in death penalty cases.

¶ 415)    Jonathon Monroe's sentence of death is disproportionate and inappropriate in this case.

¶ 419)    The prosecutor appealed to the passions and prejudices of the jury.

**Eleventh Ground for Relief:** Jonathon Monroe's sentence of death is disproportionate and inappropriate in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Twelfth Ground for Relief:** Ohio's statutory scheme for the imposition of the death penalty violates Article I, §§ 2, 9, 10, and 16 of the Ohio Constitution as well as the Fifth, Sixth, Eighth, and Fourteenth Amendments.

    **A)**    It constitutes cruel and unusual punishment;

    **B)**    Unbridled prosecutorial discretion in charging decisions results in arbitrary and capricious application;

    **C)**    Premeditation or deliberation is not required as a culpable mental state in all cases;

    **D)**    The fact-finder's discretion is unguided in that it is not provided with a standard of proof by which to judge mitigating factors;

    **E)**    The fact-finder's discretion is unguided in that it is not provided with a standard with which to balance mitigating factors against aggravating circumstances;

    **F)**    The fact-finder is required to consider aggravating circumstances during the culpability phase of the trial, thus thwarting the rationale behind bifurcation;

    **G)**    Felony murderers are treated more harshly than premeditated murderers;

    **H)**    Sentencers are not allowed to bestow mercy or impose a life sentence if the aggravating circumstances outweigh the mitigating factors;

    **I)**    Use of the same jury at both the culpability and sentencing phases of trial deprives defendants of an impartial jury and effective assistance of counsel;

    **J)**    Due to Ohio R. Crim. P. 11(C)(3), defendants are encouraged to waive their fundamental rights and enter guilty pleas;

**K)**   Ohio employs a mandatory death penalty;

**L)**   Sentencing discretion has been eliminated;

**M)**   A jury is required to recommend death if it finds that the aggravating circumstances outweigh the mitigating factors; and

**N)**   It infringes upon a fundamental liberty interest, namely life, without requiring the State to first demonstrate that it has a compelling interest in executing prisoners, and that executions are the least restrictive means available to accomplish these objections.

**O)**   Adequate appellate and proportionality review is not provided for.

**P)**   Ohio does not provide an adequate system of post conviction review to permit Monroe to fully and fairly present his claims of constitutional deprivations to the state courts, thus denying him due process.

**Thirteenth Ground for Relief**: Jonathon Monroe's sentence of death was obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments as well as the various treaty and compact obligations of the United States under international law;

**Fourteenth Ground for Relief**: Ohio has failed to provide an adequate system of appellate and proportionality review in death penalty cases.

**Fifteenth Ground for Relief**: Ohio provided Monroe an inadequate post-conviction remedy to permit Monroe to fully and fairly vindicate his federal constitutional claims in the state courts under principles of comity and federalism.

(Doc. # 10.)

## IV.  Procedural Default Discussion

This matter is before the Court upon respondent's motion to dismiss procedurally

defaulted claims.  (Doc. # 19.)  It does not appear that every claim petitioner has raised

in his habeas corpus petition was presented to the Ohio courts either during the direct

27

appeal or on collateral review. As a general matter, a defendant who is convicted in Ohio of a criminal offense has available to him more than one method of challenging that conviction. Claims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of *res judicata*. *State v. Perry*, 10 Ohio St. 2d 175 (1967). Issues that must be raised in a postconviction action pursuant to R.C. §2953.21 include claims that do not appear on the face of the record and claims of ineffective assistance of trial counsel where the defendant was represented on direct appeal by the same attorney who represented him at trial. *State v. Cole*, 2 Ohio St. 3d 112 (1982). In 1992, a third procedure of review emerged. Claims of ineffective assistance of appellate counsel must be presented to the appellate court in a motion for delayed reconsideration pursuant to *State v. Murnahan*, 63 Ohio St. 3d 60 (1992) and Ohio R. App. P. 26(B).

In addition to raising each claim in the appropriate forum, a habeas litigant, in order to preserve his constitutional claims for habeas review, must present those claims to the state's highest court. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). Thus, the judgment of conviction on direct appeal, and any adverse decision rendered by the trial court in postconviction, must be appealed to both the Ohio Court of Appeals and the Supreme Court of Ohio. Likewise, any adverse decision rendered by the Ohio Court of Appeals on a motion for delayed reconsideration must be timely appealed to the Supreme Court of Ohio.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal

28

constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal, or stay and abey, for failure to exhaust state remedies. *Id.*; *Rhines v. Weber*, 544 U.S. 269 (2005); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). But if, because of a procedural default, the petitioner can no longer present his claims to the state courts, then he has also waived those claims for purposes of federal habeas corpus review, unless he can demonstrate both cause for the procedural default, as well as actual prejudice from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must decide that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause

for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

Respondent alleges in his motion to dismiss that several of petitioner's claims, in their entirety or in part, are subject to procedural default. Respondent asserts that grounds four and six are procedurally defaulted due to petitioner's failure to preserve them at trial with a contemporaneous objection, that ground eight (sub-part A) is procedurally defaulted under Ohio's doctrine of *res judicata* because petitioner raised it in postconviction instead of on direct appeal, and that grounds one and seven are procedurally defaulted because petitioner failed to fairly present them to the Ohio courts. The Court will address each of the claims individually to determine whether those claims are subject to the procedural defaults alleged by respondent.

## A. **Ground Four -- Introduction of Repetitive, Gruesome Photographs**

In his fourth ground for relief, petitioner argues that the introduction of gruesome photographs at both the trial and penalty phases of his case deprived him of due process, a fundamentally fair trial, and a fair and reliable sentencing proceeding in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Petition, Doc. # 10, at ¶¶ 120-139.) Petitioner explains that, at the conclusion of the State's case during the trial phase, the trial court admitted 239 photographs depicting the victims and the crime scene. Petitioner further explains that, at the conclusion of the penalty phase, the trial court readmitted those

photographs and other evidence from the trial phase, over the objection of defense counsel. According to petitioner, although the trial court reasoned that the photographs were relevant to mitigation but could not be used to support the aggravating circumstances, the trial court neglected to explain that limitation to the jury. Petitioner further complains that, because no mitigation evidence was presented on his behalf, the photographs could not possibly have been relevant to mitigation. Moreover, petitioner argues, the photographs were so gruesome and gory that they could not possibly have been relevant to the existence or non-existence of any potential mitigating factor. Petitioner further asserts that, even if the admission of the photographs at the trial phase was harmless error, the readmission of those photographs at the penalty phase clearly contributed to the imposition of the death penalty by creating a climate in which the jurors could not dispassionately weigh the sole aggravating circumstance against the mitigating factors. Petitioner adds that, to the extent that counsel failed to fully object to or argue against the admission of the photographs, counsel rendered ineffective assistance. Finally, petitioner argues that he is entitled to habeas relief under 28 U.S.C. § 2254(d) because the Ohio Supreme Court's decision rejecting this claim was contrary to or involved an unreasonable application of clearly established law and/or involved an unreasonable determination of the facts based on the evidence that was presented.

Respondent asserts that petitioner's fourth ground for relief is procedurally defaulted under Ohio's contemporaneous objection rule. (Doc. # 19, at 14-21.) Specifically, respondent argues in relevant part that, "[t]o the extent that Monroe presented his allegations on direct appeal in state court, and the Supreme Court of

31

Ohio held that they were waived due to Monroe's failure to object at trial or otherwise preserve the allegations for appellate review, [his fourth ground for relief] should be dismissed as procedurally defaulted." (Doc. # 19, at 14-15.) Respondent asserts that in his second proposition of law on direct appeal to the Supreme Court of Ohio, petitioner challenged the admission in the trial and penalty phases of State's Exhibit M (morgue photos of Deccarla Quincy), State's Exhibit N (morgue photos of Travinna Simmons), and State's Exhibit P (crime scene photos). Respondent further asserts that petitioner challenged the readmission during the penalty phase of the photographs over defense counsel's objection. Quoting the Ohio Supreme Court's decision rejecting those claims, respondent argues that the Ohio Supreme Court clearly invoked Ohio's contemporaneous objection rule and reviewed those claims only for plain error. Respondent further argues that petitioner cannot demonstrate cause to excuse the default of his fourth claim for relief because the only argument he could offer-- ineffective assistance of counsel--was rejected on the merits by the Supreme Court of Ohio.

The first part of the *Maupin* test requires the Court to determine whether a state procedural rule applies to petitioner's claim, and, if so, whether petitioner violated that rule. Under Ohio's contemporaneous objection rule, the failure to object to the admission of evidence at trial waives all but plain error on appeal. *State v. Davie*, 80 Ohio St. 3d 311, 319 (1997) (failure to object to redacted videotape waived all but plain error); *State v. Loza*, 71 Ohio St. 3d 61, 75 (1994) (failure to object to "other bad acts" evidence waived all but plain error); *State v. Wiles*, 59 Ohio St. 71, 91 (1991) (finding no plain error from admission of photographs that were "clearly gruesome and repetitive").

Plain error review, in turn, is to be exercised with "utmost caution," and invoked only to prevent a clear miscarriage of justice. *State v. Underwood*, 3 Ohio St. 3d 12, 14 (1983). An alleged error "does not constitute plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St. 2d 91, paragraph two of the syllabus (1978).

A review of the transcript reveals that petitioner failed to object to admission during the trial phase of all but the photograph marked as State's Exhibit M-20, but that petitioner objected no less than four times to admission during the penalty phase of all of the photographs that the State sought to admit. With respect to the trial phase, defense counsel filed a motion in limine to exclude admission of any photographs of the victims and crime scene as gruesome or repetitive. (App. Vol. 1, at 275-79.) During a pretrial motions hearing, defense counsel and the prosecution indicated that they intended to ask the trial court to review the photographs that the prosecution intended to admit and determine whether any should be excluded. (Tr. Vol. 1, at 48.) Prior to voir dire, the prosecution brought to the trial court's attention that defense counsel had objected to the admission of State's Exhibit M-20, a morgue photograph of Deccarla Quincy depicting a large slice to her neck. (Tr. Vol. 1, at 63.) The trial court overruled the objection, concluding that no other photographs depicted that particular injury. Defense counsel did not object to or mention any other photographs. During trial, when the prosecution introduced during the testimony of Columbus Police Officer Mark Henson, among other exhibits, over two hundred photos depicting the crime scene marked as State's Exhibit P, defense counsel did not object. (Tr. Vol. 3, at 649, 725.) At the close of the State's case, the prosecution moved to admit State's Exhibit M

(morgue photographs of Deccarla Quincy), State's Exhibit N (morgue photographs of Travinna Simmons), and States's Exhibit P (crime scene photographs). (Tr. Vol. 5, at 1144-46.) Of the twenty-four photographs that comprised State's Exhibit M, the trial court excluded nine. (*Id.*, at 1144.) Of the eighteen photographs that comprised State's Exhibit N, the trial court excluded six. (*Id.*) Defense counsel voiced no objections.

With respect to the penalty phase, when the prosecution sought to readmit all of its evidence from the trial phase, defense counsel objected to the admission of the photographs. (Tr. Vol. 6, at 1484-85.) The trial court stated that it would not admit the photographs in connection with the aggravating circumstances, but that it would admit the photographs for the limited purpose of mitigation. (*Id.*, at 1485.) Subsequently, defense counsel renewed their objection to the admission of the photographs, prompting the trial court to agree to review the photographs again. (*Id.*, at 1488-89.) After the jury began its penalty phase deliberations, defense counsel renewed their objection to the admission of the photographs. (*Id.*, at 1521.) The trial stated that, having reviewed the photographs again, it would exclude three--N-2, N-3, and M-20-- and allow the remainder of the photographs, over 200 of them, to go to the jury. (*Id.*, at 1522.) At that point, defense counsel renewed their objection. (*Id.*)

Returning to the first part of the *Maupin* test, the Court concludes that petitioner violated Ohio's contemporaneous objection rule as to the admission during the trial phase of all but the photograph marked as State's Exhibit M-20. Petitioner did not

violate Ohio's contemporaneous objection rule as to the photographs that were admitted over defense counsel's objection during the penalty phase.

Under the second part of the *Maupin* test, violation of a state procedural rule will not preclude habeas corpus review unless the state courts actually enforced the procedural rule. *Harris v. Reed*, 489 U.S. 255, 261-62 (1989). In order to determine whether the state courts clearly and expressly relied on a state procedural default, this Court must look to the last state court disposition providing reasons for its decision. *See McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). In *McBee*, it appears that the state appeals court expressly applied the procedural default rule, and proceeded to only a limited review of the merits in order to determine whether the fundamental miscarriage of justice exception was applicable. *Id.* at 266. The Sixth Circuit enforced the state court procedural default, holding that the state courts had clearly and expressly relied upon two alternative grounds, procedural default or substantive lack of merit, in rejecting the petitioner's federal claim. *Id.* at 267.

On direct appeal to the Ohio Supreme Court, petitioner argued in his second proposition of law that the admission of the photographs during the trial and penalty phases of his case violated his rights to a fair trial and to a fair and reliable sentencing proceeding. Notwithstanding the passing reference in his second proposition of law challenging admission of the photographs during the penalty phase, petitioner argued more specifically in his eighth proposition of law that the trial court erred in admitting the photographs during the penalty phase over defense counsel's objection. The Ohio Supreme Court clearly enforced the contemporaneous objection rule as to all but the photograph marked as State's Exhibit M-20 admitted during the trial phase, and clearly

35

rejected on the merits petitioner's claim challenging the photographs that were admitted during the penalty phase.

Addressing just the challenge that petitioner raised in his second proposition of law to the photographs that were admitted during the trial phase, the Ohio Supreme Court held, "Monroe failed to object to the admission of any remaining photos, except for State's Exhibit M-20, and has therefore waived all but plain error." (*State v. Monroe*, 105 Ohio St. 3d 384, 388 (2005); App. Vol. 4, at 295.) The Ohio Supreme Court went on to review the trial phase admission of the photographs for plain error and concluded, "[w]e find no outcome-determinative plain error from the admission of these photos." (*Id.*) Thus, as to petitioner's claim challenging the trial phase admission of photographs depicting the victims and crime scene, the Ohio Supreme Court clearly and expressly enforced the contemporaneous objection rule against all but the photograph marked as State's Exhibit M-20.

By contrast, the Ohio Supreme Court rejected on the merits the challenge that petitioner raised in his eighth proposition of law to the photographs that were admitted during the penalty phase. Specifically, the Ohio Supreme Court held that a trial court may properly allow readmission of much or all that had been admitted during the trial phase and that exhibits from the trial phase are relevant to the death-penalty specifications as well as the nature and circumstances of the offense. Noting that the trial court had revisited its scrutiny of the photographs, the Ohio Supreme Court rejected petitioner's claim as unpersuasive. Nowhere in rejecting the claim did the Ohio Supreme Court mention the contemporaneous objection rule or plain error review. (*State v. Monroe*, 105 Ohio St. 3d at 389; App. Vol. 4, at 295.)

36

Thus, the second part of the *Maupin* test has been satisfied as to the portion of petitioner's fourth ground challenging all but the photograph marked as State's Exhibit M-20 admitted during the trial phase. Accordingly, the remainder of this procedural default discussion is limited to that portion of ground four.

The Court further finds that the procedural rule is adequate and independent under the third part of the *Maupin* test. To be "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no part on federal law. *See Coleman v. Thompson*, 501 U.S. 722, 732-33 (1991). To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia*, 498 U.S. 411 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id.* at 423 (quoting *James v. Kentucky*, 466 U.S. 341, 348-351 (1984)). *See also Barr v. City of Columbia*, 378 U.S. 146, 149 (1964); *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 297 (1964); *see also Jamison v. Collins*, 100 F. Supp.2d 521, 561 (S.D. Ohio 1998). Ohio's contemporaneous objection rule is clearly stated and regularly enforced. *See, e.g., State v. Underwood*, 3 Ohio St. 3d 12, syllabus (1983)("The failure to object to a jury instruction constitutes a waiver of any claim of error thereto...."); *State v. Durhin*, , 66 Ohio St. 2d 158, 161 (1981)(failure to object to jury instruction improperly allocating burden of proof is waiver). Ohio's contemporaneous objection rule serves important state interests in judicial economy and minimizing reversible error by enabling a trial judge to remedy errors at the earliest possible opportunity or prevent them altogether.

37

Finally, Ohio's contemporaneous objection rule--even with the application of plain error review--does not rely on or otherwise implicate federal law. The Sixth Circuit has consistently ruled that Ohio's contemporaneous objection rule is an adequate and independent procedural rule that bars federal habeas corpus review absent a demonstration of cause for the waiver and resulting prejudice. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell,* 209 F.3d 854, 866-71 (6th Cir. 2000); *see also Osborne v. Ohio*, 495 U.S. 103, 123 (1990); *Engle v. Isaac*, 456 U.S. 107, 124-25 (1982).

Petitioner argues in great length, however, that "Ohio's contemporaneous objection rule and plain error review do not constitute an adequate and independent state ground to bar federal review." (Doc. # 27, at 28.) Specifically, petitioner contends that those rules do not provide an adequate and independent state ground foreclosing federal review because they are not firmly established and regularly followed. (*Id.*, at 29-30.) Citing dozens of decisions--albeit none more recent than 1996--petitioner insists that the Ohio Supreme Court's enforcement of the contemporaneous objection rule has become so sporadic that the rule can no longer be regarded as regularly followed, sufficient to satisfy the third part of the *Maupin* test. For example, petitioner argues, the Ohio Supreme Court has at times chosen in capital cases to review the merits of issues that were not preserved at trial or the intermediate appellate court, offering as justification for ignoring waiver "'the nature of the case and the exacting review necessary where the death penalty is involved....'" (Doc. # 27, at 32 (quoting *State v. Zuern*, 32 Ohio St. 3d 56, 63 (1987).) Petitioner argues that that same court,

38

however, has inexplicably refused to find such an exception in other capital cases, electing instead to enforce waiver and review the waived claims only for plain error. (Doc. # 27, at 32-33.)

Petitioner's argument, however persuasive it may appear at first glance, is foreclosed by Sixth Circuit precedent. The Sixth Circuit has specifically addressed and rejected the argument that the Ohio appellate courts' enforcement, or lack thereof, of the contemporaneous objection rule has become so sporadic as to preclude any finding that the rule is regularly followed and consistently enforced. In *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), the petitioner had argued that Ohio's contemporaneous objection rule was, among other things, inadequate under the "adequate and independent" requirement set forth in the third part of the *Maupin* test. Citing many of the same decisions that petitioner herein has cited, the petitioner in *Scott* argued that the contemporaneous objection rule was inadequate because Ohio courts were not consistently enforcing it. The Sixth Circuit rejected that argument as follows:

> [T]hese cases do indicate that the Ohio Supreme Court employs an abundance of caution in capital cases, and, on occasion, has relaxed its enforcement of default. They do not, however, indicate that Ohio reserves so much leeway in capital cases that we are justified here in ignoring its sovereign decision founded upon its own procedural rule. In cases where state procedural grounds have not been enforced by federal courts because they were not firmly established and regularly applied, the facts have been much more extreme than these isolated examples of discretion. (citations omitted). Rather, this case is more like those in which some minor inconsistency in applying the rule has been noted but held not to be severe enough to override the federalism, finality and comity interests served by enforcing the bar. (citations omitted).

*Scott*, 209 F.3d at 869-70. The Sixth Circuit has subsequently reaffirmed its holding in *Scott*. *Keith v. Mitchell*, 455 F.3d 662, 673-74 (6th Cir. 2006) (characterizing Ohio's

contemporaneous objection rule as "firmly established" and enforcing default where the Ohio Supreme Court reviewed for and found no plain error in unobjected to dismissal of scrupled jurors); *see also Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004) (rejecting the petitioner's challenge that contemporaneous objection rule was dependent on federal law and noting the petitioner's concession that the rule was firmly established); *Hinkle v. Randle, supra*, 271 F.3d at 244 (finding that Ohio's contemporaneous objection rule was adequate and independent).

Petitioner would have this Court hold that the Ohio Supreme Court's inconsistency in applying the contemporaneous objection rule has been more than just minor. But he offers nothing beyond what the Sixth Circuit apparently considered and rejected in *Scott*. For the foregoing reasons, the Court concludes that Ohio's contemporaneous objection rule is an adequate and independent state ground upon which to deny federal review.[1]

Once the Court determines that petitioner's claim is subject to procedural default and that the procedural rule is an adequate and independent state ground upon which to deny federal review, this Court will not review the merits of that claim unless petitioner demonstrates cause and prejudice sufficient to excuse the default. The Supreme Court has refrained from establishing firm contours for the cause-and-prejudice standard that the Court adopted for excusing the default of constitutional

---

[1] To the extent that petitioner argues or intended to argue that plain error review utilizes federal law in violation of the requirement set forth in the third part of the *Maupin* test that a state procedural rule be independent of federal law, (Doc. # 27, at 38), the Sixth Circuit has squarely and more than once rejected that argument, too. *Scott v. Mitchell, supra*, 209 F.3d at 865-68; *Williams v. Bagley, supra*, 380 F.3d at 968; *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 423-24 (6th Cir. 2003).

40

claims during state court proceedings. *Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988). As a general rule, though, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Ineffective assistance of counsel is asserted frequently as "cause." In order to qualify as cause for a procedural default, counsel ineffectiveness must rise to the level of an independent constitutional violation under the standard established in *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default. *** So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington, supra*, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." *Murray v. Carrier*, 477 U.S. 478, 486-88 (1986).

This Court's review of petitioner's cause argument is circumscribed in two important respects. First, this Court may not review as cause any claim of ineffective assistance of counsel that was not also properly presented to the state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (holding that an ineffective assistance of counsel claim offered as cause for the default of a substantive federal claim must first be properly presented to the state courts). Second, under amendments to the habeas corpus statute set forth in the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), a federal court cannot grant relief on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

Petitioner offers ineffective assistance of trial counsel as cause to excuse the apparent procedural default of his fourth ground for relief. (Doc. # 27, at 16-17.) Petitioner presented that precise claim of trial counsel ineffectiveness to the Ohio Supreme Court on direct appeal (App. Vol. 4, at 81-84), thereby clearing the way for this Court to consider it. The Ohio Supreme Court rejected petitioner's claim on the merits. Citing the two-part test set forth in *Strickland v. Washington, supra*, and *State v. Bradley*, 42 Ohio St. 3d 136 (1989), the court rejected petitioner's claim, concluding that petitioner had not demonstrated prejudice. The court reasoned that, "[g]iven that the trial court reviewed the photographs--removing those it believed to be overly gruesome or repetitive--counsel were not ineffective for failing to object to the photos admitted." (*Monroe*, 105 Ohio St. 3d at 389; App. Vol. 4, at 295.)

Petitioner has not demonstrated, and it does not otherwise appear, that the Ohio Supreme Court's decision contravened or unreasonably applied clearly established federal law. The Ohio Supreme Court identified the controlling authority, correctly set forth the two-part standard for establishing ineffective assistance of counsel in violation of the Sixth Amendment, and concluded that "in no instance does Monroe demonstrate prejudice...." (*Id.*) Previously, the court had set forth the rules of evidence and case

42

law governing the admission of gruesome photographs. In view of the fact that the trial court reviewed the photographs and removed those that it found too gruesome or repetitive, it does not appear to this Court that any additional or more ardent objections from defense counsel would have persuaded the trial court to rule differently. That being so, having reviewed the record, petitioner's arguments, and relevant case law, this Court cannot disagree with, much less find unreasonable, the Ohio Supreme Court's decision rejecting petitioner's claim that his trial attorneys were ineffective for failing to object during the trial phase to the admission of the photographs comprising State's Exhibits M, N, and P. That being so, petitioner has failed to establish cause and prejudice sufficient to excuse the default of his fourth ground for relief.

Accordingly, respondent's motion to dismiss as procedurally defaulted petitioner's fourth ground for relief is GRANTED.

## B. **Ground Six -- Trial Court's Failure to Merge Counts and Aggravating Circumstances**

In his sixth ground for relief, petitioner argues that the trial court erred in failing to merge not only the eight counts of aggravated murder but also the duplicative aggravating circumstances, thereby overwhelming the weighing process in favor of death in violation of petitioner's rights to due process, a fair trial, and a fair and reliable sentencing determination. (Doc. # 10, at ¶¶ 150-167.) Petitioner explains that, although there were two victims in this case, the State charged him with a total of eight counts of aggravated murder, using four different theories of aggravated murder as to each of the two victims, to wit: aggravated murder committed with prior calculation and

design, aggravated murder committed during the commission of aggravated burglary, murder committed during the commission of aggravated robbery, and aggravated murder committed during the commission of kidnapping. Petitioner further explains that four statutory aggravated circumstances were attached to each of those eight counts of aggravated murder, to wit: aggravated murder committed during commission of aggravated burglary, aggravated murder committed during commission of aggravated robbery, aggravated murder committed during kidnapping, and aggravated murder committed during a course of conduct involving the purposeful killing or attempt to kill two or more persons. Petitioner complains that the trial court's penalty phase instructions, as well as the verdict forms, suggested to the jury that it was permissible to aggregate the aggravating circumstances from each count and weigh them collectively against the mitigating factors, when under Ohio law, jurors must weigh separately the aggravating circumstances against all of the mitigating factors. Petitioner argues that because the State was not required to elect aggravated murder counts and because the trial court was not required to merge duplicative aggravating circumstances, the resulting "stacking" of aggravated murder counts and duplicative aggravating circumstances rendered the weighing process meaningless by overwhelming any possibility of petitioner demonstrating that the mitigating factors were not outweighed by the collective weight of thirty-two aggravating circumstances attached to eight counts of aggravated murder.

Noting that petitioner failed to request a merger of the aggravating circumstances, respondent argues that ground six is barred under Ohio's contemporaneous objection rule. The first part of the *Maupin* test requires the Court to

44

determine whether a state procedural rule applies to petitioner's claim, and, if so, whether petitioner violated that rule. Under Ohio's contemporaneous objection rule, the failure to request the trial court to merge duplicative aggravating circumstances waives all but plain error. *State v. Turner*, 105 Ohio St. 3d 331, 341-42 (2005); *State v. Bryan*, 101 Ohio St. 3d 272, 302 (2004); *State v. Lynch*, 98 Ohio St. 3d 514, 536 (2003); *State v. Palmer*, 80 Ohio St. 3d 543, 574-75 (1997). Similarly, the failure to object to jury instructions involving the merger or consideration of aggravating circumstances also waives all but plain error. *See State v. Twyford*, 94 Ohio St. 3d 340, 350 (2002) (finding waived claimed error in jury instructions concerning weighing the aggravating circumstances from a single count against all of the mitigating factors); *see also State v. Smith*, 80 Ohio St. 3d 89, 115 (1997) (finding waived claimed error in jury instruction concerning merger of death penalty specifications). Thus, the Court finds that Ohio's contemporaneous objection rule applies to petitioner's sixth ground for relief.

Regarding whether petitioner violated that rule, petitioner argues in the first instance that he did not violate. Petitioner appears to argue in the alternative that, to the extent that his counsel failed to adequately object to, or demonstrate the unconstitutionality of, the trial court's failure to merge the aggravated murder counts and the duplicative aggravating circumstances, counsel rendered ineffective assistance sufficient to excuse his procedural default.

Petitioner argues that the Ohio Supreme Court erred in determining that he had not requested merger of any of the counts or any of the statutory aggravating circumstances. According to petitioner, "[c]ounsel for Monroe clearly brought this issue

to the attention of the trial judge by requesting that the court limit the instructions and verdict forms to a conclusion of weighing the statutory aggravating circumstances for victim one against the mitigating circumstances for victim one and have one verdict form upon which to consider that." (Doc. # 27, at 19, citing Tr. Vol. 6, at 1489-90.) Petitioner goes on to argue that, at the conclusion of the penalty phase jury instructions, defense counsel subsequently renewed their objection to the trial court's intention to send twenty-four verdict forms back with the jury. (*Id.*, citing Tr. Vol. 6, at 1522.) From this, petitioner asserts, "[i]t is clear that counsel had a discussion with the court -- off the record -- about the jury instructions concerning the multiple and duplicative charges of aggravated murder and the related duplicative accumulation of statutory aggravating circumstances." (*Id.*) In this Court's view, the record supports no such assertion.

During the penalty phase of the trial, after the close of evidence but before closing arguments and jury instructions, defense counsel objected to, among other things, "the concept of the 24 verdict forms going to the jury." (Tr. Vol. 6, at 1489.) Specifically, Mr. Janes explained:

> We had discussions with the court in chambers and we understand the instructions that they are going to go forward as they are, but it will be our position that since there are, in fact, two victims that there would be verdicts basically for the first victim, and that either determine the aggravating circumstances outweigh the mitigating factors and the death verdict; and the second verdict, that would be the mitigation factors outweighing the aggravating circumstances and it would then be either the 30 to 20 year sentence to life, and it would be appropriate.
>
> And we're suggesting that approach that there would be two verdict forms for victim no. 1, and two verdict forms for victim no. 2, and that's what we're suggesting, and we know the court will go ahead.

46

(Tr. Vol. 6, at 1489-90.) Subsequently, just before the jury retired to deliberate, defense counsel renewed their objection "as to the 24 verdict forms." (*Id.*, at 1522.)

Under Ohio law, aggravated murder counts involving the same victim must be merged before the trial court imposes sentence. *See, e.g., State v. O'Neal*, 87 Ohio St. 3d 402, 414-15 (2000). "However, sentencing an accused on each of two murder counts, involving a single victim, represents a procedural error that is harmless beyond a reasonable doubt. (*Id.*, at 415 (internal quotation marks and citations omitted).) Further, as to multiple aggravating circumstances attached to an aggravated murder count, "[i]n the penalty phase of a capital prosecution, where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing...." *State v. Jenkins*, 15 Ohio St. 3d 164, paragraph five of the syllabus (1984). The record does not reflect that defense counsel made any such arguments, on or off the record, or otherwise alerted the trial court that they sought either merger of the aggravated murder counts and/or merger of the aggravating circumstances attached to each aggravated murder count. In fact, what little the record does reflect about what defense counsel sought, on or off the record, suggests that defense counsel sought the opposite of what petitioner now contends they sought--namely, a single "death" verdict form for each of the two victims that would have contained all of the aggravated murder counts and all of the aggravating circumstances.

Ohio law prohibits the aggregating of aggravating circumstances. *See, e.g., State v. Cooey*, 46 Ohio St. 3d 20, paragraph three of the syllabus (1989) (holding that

47

when a capital defendant is convicted of more than one count of aggravated murder, the penalty for each count must be assessed separately and that only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count). Both the prosecution and the trial judge appeared to fear that defense counsel's request to reduce the number of verdict forms might invite, if not require, such aggregation by the jury in weighing the aggravating circumstances against the mitigating factors. In response to defense counsel's suggestion that there be just a "life" verdict form and a "death" verdict form as to each of the two victims, the prosecution pointed out that "there are four counts per victim that the jury might decide with respect to one victim that death is appropriate and not for the other." (Tr. Vol. 6, at 1490.) The trial court agreed, stating that the procedure of assessing separately the penalty for each aggravated murder count "is in the benefit of the defendant more than to the benefit of the State of Ohio." (Id.) Whatever it was that defense counsel sought in reducing the number of verdict forms from twenty-four to four, the record does not support a conclusion that it was merger of the aggravated murder counts or of the aggravating circumstances as argued by petitioner in his sixth ground for relief. Returning to the first part of the Maupin test, the Court rejects petitioner's argument that he did not violate Ohio's contemporaneous objection rule as to his sixth ground for relief.

The Court further concludes, under the second part of the Maupin test, that the state courts actually enforced the procedural default. Petitioner raised this claim on direct appeal as his twelfth proposition of law. In rejecting it, the Ohio Supreme Court clearly and expressly stated, "[b]ecause Monroe failed to request a merger of the

aggravated circumstances at trial, he waived all but plain error." (*Monroe*, 105 Ohio St. 3d at 395; App. Vol. 4, at 299.) The Ohio Supreme Court went on to review the claim and concluded that "[t]he trial court did not commit plain error in failing to merge any of the death-penalty specifications." (*Id.*, at 396; 300.) Thus, the Ohio Supreme Court clearly and expressly enforced the procedural rule. Thus, the second part of the *Maupin* test has been satisfied.

As for the third part of the *Maupin* test, the Court has already determined that Ohio's contemporaneous objection rule is an adequate and independent state ground upon which to deny federal habeas corpus relief. Turning to the fourth part of the *Maupin* test, *i.e.*, whether petitioner can demonstrate cause and prejudice sufficient to excuse the apparent default of his sixth ground for relief, petitioner offers ineffective assistance of trial counsel. Specifically, as noted above, petitioner argues that, to the extent that his defense counsel had failed to adequately object to, or demonstrate the unconstitutionality of, the failure of the trial court to merge the aggravated murder counts and duplicative aggravating circumstances, counsel had rendered ineffective assistance. (Doc. # 27, at 19-20.) Petitioner raised the claim of trial counsel ineffectiveness first to the Ohio Supreme Court on direct appeal. (App. Vol. 4, at 105-106.) The Ohio Supreme Court rejected the claim on the merits. (*Monroe*, 105 Ohio St. 3d at 401; App. Vol. 4, at 304.) Subsequently, he raised the claim to the trial court, intermediate appellate court, and Ohio Supreme Court in his postconviction proceeding, albeit only as an aside to his argument that the trial court had erred in failing to merge the aggravated murder counts and the duplicative aggravating circumstances. (App.

Vol. 6, at 78; App. Vol. 8, at 46; App. Vol. 9, at 46.)  The trial court rejected petitioner's

ineffective assistance claim on the merits (App. Vol. 6, at 369), the intermediate

appellate court did not address it, simply affirming in conclusory form that petitioner's

merger claim was barred by *res judicata* (App. Vol. 8, at 202), and the Ohio Supreme

Court declined to accept jurisdiction over petitioner's appeal, thereby letting stand the

lower courts' rulings (App. Vol. 9, at 134).  Petitioner presented his trial counsel

ineffectiveness claims to the state courts sufficient to allow this Court to address it.  *See*

*Edwards v. Carpenter, supra*, 529 U.S. at 452-53 (holding that an ineffective assistance

of counsel claim offered as cause for the default of a substantive federal claim must

first be properly presented to the state courts).

The Ohio Supreme Court on direct appeal and the trial court in postconviction

concluded expressly and after careful review of the law applicable to merger that

defense counsel were not ineffective under *Strickland* for failing to request merger of

the aggravated murder counts or duplicative aggravating circumstances.  After

explaining why merger was not required for any of the aggravating circumstances--

noting specifically that the kidnappings and aggravated robbery were independent of

each other, that the aggravated burglary and aggravated robbery were separate

offenses that did not arise from the same act, that aggravated burglary and kidnapping

are not allied offenses of similar import, and that the multiple-murder course of conduct

stemming from the purposeful murders of two women was distinctly different from

committing murder during an aggravated burglary, an aggravated robbery, or

kidnapping--the Ohio Supreme Court concluded, among other things, that defense

counsel had not been ineffective under *Strickland* for failing to request merger of the

50

aggravating circumstances. (*Monroe*, 105 Ohio St. 3d at 395-96, 401; App. Vol. 4, at 299-300, 304.) The trial court reached the same conclusion in postconviction, setting forth in considerable detail why merger was not required for the aggravated murder counts, and why merger was not required for any of the aggravating circumstances, in finding neither deficient performance nor prejudice from defense counsel's failure to request merger. (App. Vol. 6, at 364-69.) This Court does not disagree with, much less find unreasonable, that conclusion.

This Court's own review of Ohio law governing the circumstances under which merger of multiple aggravated murder counts for a single victim is required and merger of multiple aggravating circumstances attached to a single count is required substantiates the reasoning and conclusion reached by the state courts that the trial court did not err in failing to merge the counts or aggravating circumstances and that defense counsel did not perform unreasonably or to petitioner's prejudice in not asking for the merger. As noted above, under Ohio law, aggravated murder counts involving the same victim must be merged before the trial court imposes sentence. *See, e.g., State v. O'Neal*, 87 Ohio St. 3d 402, 414-15 (2000). However, the Ohio Supreme Court has held on numerous occasions that there is no error in submitting to the jury multiple aggravated murder counts for a single victim. *State v. Lynch*, 98 Ohio St. 3d 514, 535 (2003); *State v. Twyford*, 94 Ohio St. 3d 340, 351 (2002); *State v. O'Neal*, 87 Ohio St. 3d 402, 415 (2000); *State v. Moore*, 81 Ohio St. 3d 22, 39 (1998); *State v. Woodard*, 68 Ohio St. 3d 70, 78-79 (1993); *State v. Waddy*, 63 Ohio St. 3d 424, 447 (1992).

The Court also noted above that, as to multiple aggravating circumstances attached to an aggravated murder count, "[i]n the penalty phase of a capital prosecution, where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing...." *State v. Jenkins*, 15 Ohio St. 3d 164, paragraph five of the syllabus (1984). There is no shortage of Ohio Supreme Court cases affirming the corollary principle that merger of multiple aggravating circumstances is *not* required where the acts giving rise to those aggravating circumstances are distinct or committed with separate animus. *State v. Foust*, 105 Ohio St. 3d 137, 164 (2004); *State v. Jones*, 91 Ohio St. 3d 335, 349 (2001); *State v. Robb*, 88 Ohio St. 3d 59, 85 (2000); *State v. Frazier*, 61 Ohio St. 3d 247, 256 (1991). Where, as here, the Ohio Supreme Court conducted a careful analysis of each aggravating circumstance to determine whether any arose from the same act or indivisible course of conduct, or were committed with the same animus, this Court cannot find unreasonable the Ohio Supreme Court's conclusion that merger was not required for any of the aggravating circumstances and that counsel were not ineffective for failing to request merger.

Furthermore, even assuming that counsel performed deficiently by failing to request merger of the aggravating circumstances--a conclusion that finds no support in the case law or this record--this Court cannot help but conclude that no prejudice resulted from that alleged error. Given the paucity of mitigation evidence that petitioner presented during his penalty hearing, it tests the limits of credulity to suggest, as petitioner has, that the "needless stacking of aggravating circumstances overwhelmed

any possibility that [petitioner] may have had of demonstrating that the mitigating factors he could have presented were not outweighed by the collective weight of thirty-two statutory aggravating circumstances attached to eight separate counts of aggravated murder." (Petition, Doc. # 10, at ¶ 156.) *Cf. State v. Chinn*, 85 Ohio St. 3d 548, 557 (1999) ("given the dearth of mitigating evidence in this case, it is clear to us that the outcome of appellant's trial would not have been any different had the three specifications of aggravating circumstances been merged into one prior to the penalty phase"); *State v. Palmer*, 80 Ohio St. 3d 543, 575 (1997) (same).

For the foregoing reasons, the Court concludes under the fourth part of the *Maupin* test that petitioner's claim of ineffective assistance of counsel does not constitute cause and prejudice sufficient to excuse the default of his sixth ground for relief. The state courts rejected that claim of trial counsel ineffectiveness and that conclusion does not contravene or unreasonably apply controlling federal law. Accordingly, petitioner's sixth ground for relief is barred by procedural default. Respondent's motion to dismiss ground six is GRANTED.

## C. Ground Eight (A) -- Jury Selection and Voir Dire Errors

In sub-part (A) of his eighth ground for relief, petitioner argues that he was denied due process, a fair trial, and the effective assistance of counsel during the jury selection process, including voir dire. (Petition, Doc. # 10, at ¶¶ 180-84.) One of petitioner's allegations is that defense counsel failed to cull the pool of jurors who harbored preconceived notions of guilt and sentence, thereby resulting in a jury that was "conviction prone and inordinately prone to impose a sentence of death." (*Id.*, at ¶

181.) Petitioner also argues that the trial court ignored the standards set forth in R.C. § 2945.25(C), in favor of less stringent standards set forth in *Wainwright v. Witt*, 469 U.S. 412 (1985), concerning excusing jurors who express scruples about the death penalty. Petitioner goes on to argue that the trial court erred in denying defense counsel's request for comprehensive, individual sequestered voir dire, forcing counsel instead to conduct voir dire of groups of six prospective jurors. Another of petitioner's allegations is that defense counsel failed to examine prospective jurors about general theories of defense or mitigation and, as to a few prospective jurors, asked no questions at all. Finally, petitioner argues that defense counsel failed to rehabilitate potential jurors who expressed scruples about the death penalty and failed to object when the prosecution asked prospective jurors whether they feared criticism if they failed to return a death verdict.

Respondent argues that this claim is defaulted under Ohio's doctrine of *res judicata*. (Doc. # 19, at 21-24.) Noting that petitioner's claim is based solely on the trial record, respondent argues that petitioner violated the *res judicata* rule by raising the claim in his postconviction action instead of on direct appeal. Respondent further argues that the state courts actually enforced the rule, that the Sixth Circuit has consistently found the rule to be adequate and independent, and that petitioner cannot demonstrate cause and prejudice sufficient to excuse the default.

Petitioner appears to concede that he erred in raising this claim in postconviction instead of on direct appeal, but goes on to argue that ineffective assistance of appellate counsel constitutes cause and prejudice sufficient to excuse the default. (Doc. # 27, at 27-28.)

The first part of the *Maupin* test requires the Court to determine whether a state procedural rule is applicable to petitioner's claim and, if so, whether petitioner violated that rule. As noted *supra*, claims appearing on the face of the record must be raised on direct appeal or they will be waived under Ohio's doctrine of *res judicata*. *State v. Perry, supra*. Claims that involve matters outside the record must be raised and supported by evidence *dehors* the record in state postconviction proceedings. The allegations comprising sub-part (A) of petitioner's eighth ground for relief squarely appear on the face of the record. Thus, petitioner appears to have violated Ohio's *res judicata* rule when he raised the claim in postconviction (as his sixteenth ground for relief) instead of on direct appeal. Petitioner does not appear to argue otherwise.

Under the second part of the *Maupin* test, the Court must determine whether the state courts clearly and expressly enforced the procedural default against petitioner's claim. In this instance, both the trial court and intermediate appellate court clearly and expressly dismissed petitioner's claim on the basis of *res judicata*, although the trial court went on to address the merits in the alternative. (App. Vol. 6, at 376-80; App. Vol. 8, at 207.) The Ohio Supreme Court declined to accept jurisdiction over petitioner's appeal, thereby letting stand the lower courts' rulings (App. Vol. 9, at 134). Thus, the second part of the *Maupin* test has been satisfied and petitioner does not appear to argue otherwise.

The Court further finds that the procedural rule is adequate and independent under the third part of the *Maupin* test. As noted earlier, to be "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no

part on federal law. *See Coleman v. Thompson*, 501 U.S. at 732-33. To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia*, 498 U.S. 411 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id.* at 423 (quoting *James v. Kentucky*, 466 U.S. at 348-351).

The Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of *res judicata*, *i.e.*, the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427-29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). The doctrine of *res judicata* is stated in unmistakable terms in countless Ohio decisions, and Ohio courts have consistently refused, in reliance on that doctrine, to review the merits of claims. *See State v. Cole*, 2 Ohio St. 3d 112, 443 N.E.2d 169 (1982); *State v. Ishmail*, 67 Ohio St. 2d 16, 423 N.E.2d 1068 (1981). Further, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Court concludes that *res judicata* does not rely on or otherwise implicate federal law. Accordingly, this Court is satisfied from its own review of relevant case law that the *Perry* rule is an adequate and independent ground for denying relief.

Once the Court determines that a constitutional claim is subject to procedural default, the Court may not address the merits of that claim absent a showing by petitioner of cause to excuse the default and actual prejudice from the underlying constitutional claim. Petitioner offers ineffective assistance of appellate counsel as cause, insisting that he presented that claim to the state courts sufficient for this Court to review it. A review of the record confirms that petitioner presented the substance of this appellate counsel ineffectiveness claim to the Ohio Supreme Court in his Application for Reopening (and accompanying affidavit) pursuant to S. Ct. R. Prac. XI (5), the procedure in Ohio for raising claims of ineffective assistance of appellate counsel. (App. Vol. 5, at 23, 39-40.)

The Ohio Supreme Court summarily denied his application without opinion. (*Id.*, at 161.) Under those circumstances, where the state court's decision presents this Court with results but not reasoning, this Court is obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies federal law, or involves an unreasonable determination of the facts. *See Maldonado v. Brigano*, 416 F.3d 470, 475-76 (6th Cir. 2005); *Howard v. Bouchard*, 405 F.3d 459, 467-68 (6th Cir. 2005); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).

In order to qualify as cause for a procedural default, counsel ineffectiveness must rise to the level of an independent constitutional violation under the standard established in *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default. ***

So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington, supra,* we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." *Murray v. Carrier,* 477 U.S. 478, 486-88 (1986).

The *Strickland* test applies to appellate counsel. *Burger v. Kemp,* 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey,* 469 U.S. 387, 396-97 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986)(quoting *Jones v. Barnes,* 463 U.S. 745, 751-52 (1983)). Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic. The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

A.  Were the omitted issues "significant and obvious?"

B.  Was there arguably contrary authority on the omitted issues?

C.  Were the omitted issues clearly stronger than those presented?

D.  Were the omitted issues objected to at trial?

E.  Were the trial court's rulings subject to deference on appeal?

F.  Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

G.  What was appellate counsel's level of experience and expertise?

H.    Did the petitioner and appellate counsel meet and go over possible
      issues?

I.    Is there evidence that counsel reviewed all the facts?

J.    Were the omitted issues dealt with in other assignments of error?

K.    Was the decision to omit an issue an unreasonable one which only an
      incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999). The Sixth Circuit cautioned,

however, that this list is not exhaustive and need not produce a certain "score." *Id.* at

428.

        In sum, to establish a claim of ineffective assistance of counsel sufficient to

establish cause for the default of this claim for relief, petitioner must show both deficient

performance on the part of his appellate attorneys and prejudice from the deficient

performance:

        First, the defendant must show that counsel's performance was deficient.
        This requires showing that counsel made errors so serious that counsel
        was not functioning as the "counsel" guaranteed the defendant by the
        Sixth Amendment.  Second, the defendant must show that deficient
        performance prejudiced the defense.  This requires showing that
        counsel's errors were so serious as to deprive the defendant of a fair trial,
        a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the first prong of

the *Strickland* test, the Court notes that, "[b]ecause of the difficulties inherent in making

the evaluation, a court must indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance." *Id.* at 689. To establish

the second prong of the *Strickland* test, *i.e.*, prejudice, a petitioner must demonstrate

59

that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

An examination of the *Mapes* factors does not lead this Court to conclude that the Ohio Supreme Court's decision denying petitioner's claims of ineffective assistance of counsel contravened or unreasonably applied controlling federal law. The issues set forth by petitioner in assailing the manner in which the trial court and his own defense counsel conducted *voir dire* do not strike this Court as significant or obvious. Specifically, the record reveals plenty of instances during which defense counsel actually did what petitioner complains that they did not. For example, defense counsel did pepper their examination of prospective jurors with questions about general theories--such as the concept of reasonable doubt, the prosecution's burden of proof, and an explanation of lesser included offenses (Tr. Vol. 2, at 339-40)--as well as possible mitigating factors--such as "how someone was raised" (Tr. Vol. 2, at 287), the concept of mitigating factors (Tr. Vol. 2, at 313), and an accused's background (Tr. Vol. 2, at 351-52). Further, contrary to petitioner's assertion, defense counsel several times attempted to rehabilitate jurors who had expressed reservations about the death penalty (Tr. Vol. 2, at 344-46, 346-49, 356-57). Thus, a review of the entire voir dire transcript would not, in this Court's view, cause a competent appellate attorney to question the standard that was applied for excusing jurors or the questioning conducted by defense counsel sufficient to characterize those issues as significant or obvious.

Continuing with the *Mapes* factors, the omitted issue was clearly stronger than a few, but not most, of the issues that were presented. Admittedly, the omitted issues

60

were not dealt with in any other assignments of error. Appellate counsel raised thirteen issues on appeal. It would be difficult to say that these challenges to the manner in which *voir dire* was conducted were stronger than the issues surrounding petitioner waiving his right to present available mitigating evidence or the trial court's admission during the trial and penalty phases of hundreds of photographs of the victims, or even issues concerning the sufficiency of the evidence or correctness of the jury instructions. Appellate counsel raised thirteen issues on appeal, leading to an inference that "winnowing out weaker arguments" was something of a priority for appellate counsel, even though appellate attorneys in capital cases might reasonably decide to err on the side of inclusion.

Two additional *Mapes* factors clearly do not favor petitioner -- namely, whether there was contrary authority on the omitted issue and whether the trial court's ruling was subject to deference on appeal. Concerning petitioner's argument that the trial court erred in applying as the standard for excusing jurors the less stringent standard set forth in *Wainwright v. Witt*, 469 U.S. 412 (1985), instead of the allegedly more favorable standard set forth in R.C. § 2945.25(C), the Ohio Supreme Court has consistently rejected that argument and held that the "the *Witt* standard is the correct standard for determining when a prospective juror may be excluded for cause based on his or her opposition to the death penalty." *State v. Jackson*, 107 Ohio St. 3d 53, 59 (2005). *See also State v. Myers*, 97 Ohio St. 3d 335, 350 (2002); *State v. Wilson*, 74 Ohio St. 3d 381, 388 (1996); *State v. Tyler*, 50 Ohio St. 3d 24, 30 (1990). Further, it is well settled that trial courts enjoy considerable latitude and discretion in the conduct of voir dire.

*See, e.g., State v. Wilson, supra*, 74 Ohio St. 3d at 386; *State v. Bedford*, 39 Ohio St. 3d 122, 129 (1988); *State v. Beuke*, 38 Ohio St. 3d 29, 39 (1988). Finally, regarding petitioner's argument that defense counsel performed deficiently and to his prejudice in failing to ask prospective jurors about defense theories or possible mitigating factors, in addition to the fact that his argument finds little support in the record, the Ohio Supreme Court has held that the "failure to inquire about various mitigating factors during voir dire does not constitute ineffective assistance." *State v. Goodwin*, 84 Ohio St. 3d 331, 335 (1999). *See also State v. Goff*, 82 Ohio St. 3d 123, 140 (1998); *State v. Phillips*, 74 Ohio St. 3d 72, 86 (1995).

Several *Mapes* factors either are not reflected by the record or do not speak one way or the other about appellate counsel's performance. Appellate counsel has never testified in a collateral proceeding about their strategy on appeal. The record simply does not reflect whether or to what extent appellate counsel met with petitioner to discuss possible issues to raise on appeal. Nor does the record reflect the level of counsel's experience and expertise. As for whether there is evidence demonstrating that appellate counsel reviewed all of the facts, although there is no direct evidence demonstrating as much, a review of the briefs and other pleadings filed by petitioner's appellate attorneys strongly indicate that they thoroughly reviewed the transcript and trial record, and were well versed on the facts of petitioner's case.

The final *Mapes* factor directs the Court to consider whether the decision to omit the issue was an unreasonable decision that only an incompetent attorney would make. After careful review, the Court answers that inquiry in the negative, and further finds,

62

under the two-pronged *Strickland* standard, that petitioner cannot demonstrate ineffective assistance of appellate counsel sufficient to establish cause for the default of sub-part (A) of his eighth ground for relief. A review of the *voir dire* transcript, as well as the relevant law governing petitioner's specific challenges, leads this Court to conclude that the trial court and defense counsel errors alleged by petitioner were not strong, obvious, meritorious, or likely at all to prevail on appeal.

Accordingly, this Court cannot conclude, under the *Strickland* standard, that his appellate attorneys performed deficiently or to his prejudice in failing to raise them. For that reason, this Court cannot conclude, under § 2254(d), that the result of the Ohio Supreme Court's decision denying petitioner's appellate counsel ineffectiveness claim contravened federal law. The Court concludes that appellate counsel ineffectiveness does not constitute cause and prejudice sufficient to excuse the procedural default of sub-part (A) of petitioner's eighth ground for relief. Respondent's motion to dismiss sub-part (A) of petitioner's eighth ground for relief as procedurally defaulted is GRANTED.

### D. Ground One ¶¶ 96-99 -- Prosecutorial Misconduct

In his first ground for relief, petitioner argues that he was denied due process and a fair trial by ongoing misconduct of the prosecuting attorney. One of petitioner's arguments is that the prosecutor, during closing arguments of the trial phase, improperly appealed to the passions and prejudices of the jurors by focusing on the pain and suffering experienced by the victims. (Doc. # 10, at ¶¶ 96-99.) Petitioner's other argument is that the prosecution committed misconduct in presenting the

63

testimony of former prosecuting attorney David Devillers. (*Id.*, at ¶¶ 77-95.) Petitioner complains that although the State called Devillers ostensibly to refute the existence of any secret deals between the State and accomplice-witness Shannon Boyd allegedly suggested by defense counsel during cross examination, the State went on to elicit testimony from Devillers not only offering "expert" opinions regarding certain areas of the law, but more critically vouching for the truthfulness of Shannon Boyd.

Respondent argues that these two components of petitioner's prosecutorial misconduct claim are waived because petitioner failed to fairly and properly present them to the state courts. (Doc. # 19, at 24-26.)

### (1.) **Prosecutorial Misconduct During Closing Arguments**

As to petitioner's allegations that the prosecutor improperly appealed during trial phase closing arguments to the passions and prejudices of the jurors, respondent argues that when petitioner failed during state postconviction proceedings to include these allegations on appeal to the intermediate court of appeals from the trial court's decision denying his claims, he violated the fair presentment requirement which demands that a litigant not only give the state courts a fair opportunity to act on the same claim he seeks to present in habeas, but also appeal the denial of any such claims to each requisite state court.

Petitioner concedes that he raised these allegations in his postconviction action and that he subsequently failed to include them in his appeal to the intermediate court of appeals from the trial court's decision denying his claims. He asserts, however, that the reason he did not include those allegations in his postconviction appeal was because they were based entirely on the trial record and never should have been raised

64

in postconviction in the first place. As record claims, petitioner argues, those allegations should have been, but were not, raised on direct appeal. Petitioner argues that he properly included these allegations in his Application to Reopen his direct appeal as underlying claims to his ineffective assistance of appellate counsel claim. More specifically, petitioner concedes that this claim was waived when it was not raised on direct appeal and argues that ineffective assistance of appellate counsel constitutes cause and prejudice sufficient to excuse the default. (Doc. # 27, at 7-8.)

The first part of the *Maupin* test requires the Court to determine whether a state procedural rule is applicable to petitioner's claim and, if so, whether petitioner violated that rule. As noted *supra*, claims appearing on the face of the record must be raised on direct appeal or they will be waived under Ohio's doctrine of *res judicata*. *State v. Perry, supra*. Claims that involve matters outside the record must be raised and supported by evidence *dehors* the record in state postconviction proceedings. Petitioner's allegations that the prosecuting attorney committed misconduct during trial phase closing arguments by appealing to the passions and prejudices of the jury squarely appear on the face of the record. Thus, petitioner violated Ohio's *res judicata* rule when he failed to raise the allegations on direct appeal. Petitioner does not argue otherwise.

Under the second part of the *Maupin* test, the Court must determine whether the state courts clearly and expressly enforced the procedural default against petitioner's claim. The Ohio Supreme Court was never given an opportunity to enforce the *res judicata* rule, due to the nature of the procedural default, *i.e.*, petitioner's failure to raise

65

the allegations on direct appeal. That being so, the Court deems the second part of the *Maupin* test to have been met.

The Court has already determined under the third part of the *Maupin* test that Ohio's doctrine of *res judicata* is an adequate and independent state ground upon which to deny federal habeas review. Before addressing the fourth part of the *Maupin* test, *i.e.*, whether petitioner can establish cause and prejudice sufficient to excuse the apparent default of paragraphs 96 through 99 of his first ground for relief, the Court notes that petitioner did, in fact, present these allegations to the trial court in his postconviction action as his thirteenth claim for relief.

Although petitioner clearly violated Ohio's *res judicata* rule in doing so, thereby satisfying the first part of the *Maupin* test, the trial court did not clearly or expressly enforce that rule. Under the second part of the *Maupin* test, violation of a state procedural rule will not preclude federal habeas corpus review if the state courts do not enforce the procedural rule. "Under certain circumstances, a merits ruling by the last reviewing state court will 'forgive' a procedural default finding made by the lower court, so as to permit federal court review of the claim." *Jamison v. Collins*, 100 F. Supp.2d 521, 553-54 (S.D. Ohio 1998) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989); *County Court of Ulster County, New York v. Allen*, 442 U.S. 140 (1979)); *see also Abela v. Martin*, 380 F.3d 915, 922-24 (6th Cir. 2004) (declining to enforce procedural default where last reviewing state court did not clearly and unambiguously indicate that denial of claim was based on procedural rule). In the instant case, the trial court clearly and expressly rejected petitioner's allegations

solely on the merits, plainly failing the second part of the *Maupin* test. (App. Vol. 6, at 374-75.) But the inquiry does not end here.

Although the trial court, by addressing the merits of petitioner's prosecutorial misconduct claim, essentially revived a claim that otherwise would have been defaulted, petitioner subjected the claim to waiver again when he failed to include these allegations on appeal from the trial court's decision denying his claim. A state prisoner must exhaust available state court remedies before he can secure federal habeas corpus review. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Picard v. Connor*, 404 U.S. 270, 275 (1971). A petitioner satisfies the exhaustion requirement when he raises the claim in a manner that affords the state courts a fair opportunity to address the federal constitutional issue. *See, e.g., Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). As noted above, in addition to raising each claim in the appropriate forum, a habeas litigant must present those claims to the state's highest court in order to preserve them for habeas review. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). Thus, any adverse decision rendered by the trial court in postconviction must be appealed to both the Ohio Court of Appeals and the Supreme Court of Ohio. *See O'Sullivan*, 526 U.S. at 845 ("we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review procedures before he presents his claims to a federal court."). If petitioner has not fairly presented his claims, and no state remedy exists for him to do so, then his claim is exhausted and

procedurally defaulted, and this Court may not address the claim absent a showing of cause and prejudice. *See, e.g., Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

It is undisputed that petitioner did not include on appeal from the trial court's decision denying his postconviction claims the allegations set forth in paragraphs 96 through 99 of his first ground for relief--namely, that the prosecutor committed misconduct during the trial phase closing arguments by appealing to the jurors' passions and prejudices. Now, he no longer can. Petitioner offers no cause and prejudice arguments as to this particular waiver and none are otherwise apparent to this Court. There is no constitutional right to counsel in a collateral attack upon a criminal conviction. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). It is therefore well settled that ineffective assistance of postconviction counsel cannot be asserted as cause to excuse a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991). Thus, to the extent that the trial court revived an otherwise defaulted claim by addressing it on the merits in postconviction, petitioner committed a subsequent waiver of the claim when he failed to raise the same allegations on appeal from the trial court's decision denying his claims. But the inquiry does not end here.

The initial and primary procedural default that petitioner committed as to the prosecutorial misconduct allegations set forth in paragraphs 96 through 99 of his first ground for relief occurred when petitioner failed to raise the allegations on direct appeal. Petitioner concedes as much and offers as cause and prejudice to excuse the default ineffective assistance of appellate counsel. Petitioner properly presented that particular claim of appellate counsel ineffectiveness to the Ohio Supreme Court in his Application for Reopening (App. Vol. 5, at 27-28), thereby clearing the way for this

68

Court to address it. *See Edwards v. Carpenter*, 529 U.S. at 452-53 (holding that an ineffective assistance of counsel claim offered as cause for the default of a substantive federal claim must first be properly presented to the state courts). The Ohio Supreme Court summarily denied petitioner's application without opinion. (App. Vol. 5, at 161.) As noted earlier, where the state court's decision presents results but not reasoning, this Court is obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies federal law, or involves an unreasonable determination of the facts. *See Maldonado v. Brigano*, 416 F.3d at 475-76; *Howard v. Bouchard*, 405 F.3d at 467-68; *McKenzie v. Smith*, 326 F.3d at 727; *Harris v. Stovall*, 212 F.3d at 943.

In order to establish a claim of ineffective assistance of counsel sufficient to establish cause for the default of this claim for relief, petitioner must show both deficient performance on the part of his appellate attorneys and prejudice from the deficient performance. *Strickland*, 466 U.S. at 687; *Mapes v. Coyle*, 171 F.3d at 427-28. For reasons touched upon by the trial court in rejecting these prosecutorial misconduct allegations in postconviction, this Court concludes under *Strickland* and *Mapes* that petitioner's appellate attorneys did not perform deficiently or to his prejudice by failing to raise these allegations on direct appeal.

Nowhere in his postconviction action, his application to reopen, or his habeas corpus action did petitioner point to a single comment constituting an improper appeal by the prosecuting attorney to the jurors' passions or prejudices. Thus, it is difficult to characterize the issue as significant and obvious or stronger than the issues that were raised. Moreover, controlling case law did not favor this claim or militate in favor of

69

appellate counsel raising it. Closing arguments are to be viewed in their entirety, *see, e.g., State v. Ballew*, 76 Ohio St. 3d 244, 255 (1996); *State v. Lorraine*, 66 Ohio St. 3d 414, 420 (1993); *State v. Moritz*, 63 Ohio St. 2d 150, 157 (1980), and generally, prosecuting attorneys are entitled to considerable latitude in closing arguments, *see, e.g., Ballew*, 76 Ohio St. 3d at 255; *State v. Maurer*, 15 Ohio St. 3d 239, 269 (1984). Further, the standard for relief is onerous, insofar as appellate courts will not reverse a conviction on the basis of prosecutorial misconduct during closing arguments where it is clear beyond a reasonable doubt that the jury would have found the accused guilty even absent the alleged misconduct. *See, e.g., State v. Jones*, 90 Ohio St. 3d 403, 420 (2000); *State v. Loza*, 71 Ohio St. 3d 61, 78 (1994); *State v. Smith*, 14 Ohio St. 3d 13, 15 (1984). Finally, defense counsel did not object to any portions of the prosecution's closing arguments (Tr. Vol. 5, at 1216-33) or rebuttal arguments (Tr. Vol. 5, at 1243-58) as improperly appealing to the passions or prejudices of the jurors. This Court has reviewed the prosecution's trial phase closing and rebuttal arguments and found no remarks so egregious in their appeal to the jurors' passions and prejudices as to alert any competent attorney to raise a claim of prosecutorial misconduct.

Accordingly, this Court cannot conclude, under the *Strickland* standard, that his appellate attorneys performed deficiently or to his prejudice in failing to raise these allegations on appeal. For that reason, this Court cannot conclude, under § 2254(d), that the result of the Ohio Supreme Court's decision denying petitioner's appellate counsel ineffectiveness claim contravened federal law. The Court concludes that appellate counsel ineffectiveness does not constitute cause and prejudice sufficient to

excuse the procedural default of paragraphs 96 through 99 of petitioner's first ground for relief. Respondent's motion to dismiss paragraphs 96 through 99 of petitioner's first ground for relief as procedurally defaulted is GRANTED.

## (2.) Prosecutorial Misconduct In Presenting Testimony By Former Prosecutor Devillers

As to petitioner's claim that the prosecutor committed misconduct by presenting testimony of former prosecutor David Devillers that, among other things, vouched for the truthfulness of Shannon Boyd, respondent argues that this claim is waived because petitioner did not fairly present the same claim to the state courts on direct appeal. Noting that the only claim that petitioner presented to the Ohio Supreme Court concerning Devillers' testimony was a claim of ineffective assistance of trial counsel for counsel's failure to object to the form and substance of Devillers' testimony, respondent argues that the prosecutorial misconduct allegations set forth in petitioner's first ground for relief are waived because they are not the same claim that petitioner presented to the Ohio Supreme Court on direct appeal. (Doc. # 19, at 25-26 (citing *Duncan v. Henry*, 513 U.S. 364, 366 (1995)).) Respondent goes on to argue that because the Ohio Supreme Court held that Devillers' testimony was proper, appellate counsel cannot be deemed ineffective, sufficient to excuse the default, for failing to raise prosecutorial misconduct as opposed to ineffective assistance of trial counsel.

Petitioner argues that the ineffective assistance of counsel claim that he presented to the Ohio Supreme Court in his first proposition of law fairly presented the prosecutorial misconduct allegations that he seeks to present to this Court in his first

71

ground for relief. (Doc. # 27, at 8-14.) Petitioner explains that he devoted his first proposition of law on direct appeal to the argument that he was denied effective assistance of counsel due to counsel's failure to fully object to the prosecutor's introduction of Devillers' testimony. Petitioner reasons that the underlying theory of his ineffective assistance claim was that the prosecutor's introduction of that testimony amounted to prosecutorial misconduct because arguing that the improper opinion testimony and improper vouching by Devillers required an objection from counsel necessarily raised the claim that the specific actions to which counsel should have objected constituted prosecutorial misconduct. Petitioner goes on to argue that in order for the Ohio Supreme Court to address the issue of whether defense counsel were ineffective for failing to object to Devillers' testimony, petitioner had to raise and the Ohio Supreme Court had to address the issue of whether there was improper conduct on the part of the prosecutor in presenting Devillers' testimony. In this regard, petitioner points out that the Ohio Supreme Court rejected the ineffective assistance claim by determining, among other things, that Devillers' testimony was proper and that even if any of it was improper, any error did not affect the outcome of petitioner's trial. Thus, petitioner argues, the language and clear intent of the ineffective assistance claim that he presented to the Ohio Supreme Court are virtually identical to the prosecutorial misconduct claim that he seeks to present here.

The issue before the Court is whether petitioner's presentation to the state courts of a claim of trial counsel ineffectiveness for the failure to object to the form and substance of former prosecutor David Devillers' testimony constitutes fair presentment of the prosecutorial misconduct allegations that he seeks to present to this Court. As

72

noted above, in order to satisfy the exhaustion requirement in habeas corpus, a petitioner must fairly present the substance of his constitutional claim to the state courts. *Anderson v. Harless*, 459 U.S. 4, 6, (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Although the fair presentment requirement is a rule of comity, not jurisdiction, *see Castille v. Peoples*, 489 U.S. 346, 349 (1989); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999), it is rooted in principles of comity and federalism designed to allow state courts the opportunity to correct the State's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment. A petitioner fairly presents the "substance of his federal habeas corpus claim" when the state courts are afforded sufficient notice and a fair opportunity to apply controlling legal principles to the facts bearing upon the constitutional claim. *Harless*, 459 U.S. at 6. Although a certain degree of tinkering is permissible, a petitioner does not fairly present a claim if he presents an issue to the state courts under one legal theory and set of facts, and then presents the issue to the federal courts under a different legal theory or a different set of facts. Rather, he must present to the federal court essentially the same facts and legal theories that were considered and rejected by the state courts. *Lorraine v. Coyle*, 291 F.3d 416, 425 (6th Cir. 2002) (finding that claim of ineffective assistance of trial counsel for the failure to use a pharmacologist in the guilt phase to establish an insanity defense was an "entirely different theory" than habeas claim of ineffective assistance for the failure to develop evidence of organic brain damage and head injuries as mitigation) (citing *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998)); *Lott v. Coyle*, 261 F.3d 594, 607 (6th Cir. 2001) (finding that relatedness of claim of

involuntary jury waiver to claim of failure of trial court to follow statutory requirements for effectuating valid jury waiver was not enough to preserve the former for habeas review).

Further examination of Sixth Circuit law reveals that the fair presentment requirement is not satisfied where petitioner presented to the state courts a claim that shares a factual predicate with, but is legally or analytically distinct from, the claim that petitioner seeks to present to the federal courts. In *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005), the Sixth Circuit determined that petitioner had not fairly presented a *Batson* claim that had been presented to the state courts only as an instance of ineffective assistance of appellate counsel. As the Sixth Circuit explained, "while these two claims are related due to the fact that the ineffective assistance claim is based on the failure to raise a *Batson* challenge, the two claims are analytically distinct." *Id.*

In *Hicks v. Straub*, 377 F.3d 538, 553-56 (6th Cir. 2004), the Sixth Circuit rejected the argument that petitioner had fairly presented a Confrontation Clause claim that he had presented to the state courts as a prosecutorial misconduct claim. In that case, the district court had granted relief on petitioner's claim that his Confrontation Clause rights had been violated when the prosecutor, during opening statements, advised the jury that the petitioner had confessed to murder to a fellow jail inmate, and subsequently failed, despite a good faith effort, to produce that inmate witness. *Id.*, at 541. The Sixth Circuit reversed, concluding that petitioner had not fairly presented that Confrontation Clause claim. On direct appeal, the petitioner had argued that numerous instances of prosecutorial misconduct, including arguing matters not in evidence, such as the petitioner's supposed admission to committing murder, violated his rights to due process and a fair trial. Petitioner never argued, however, that the misconduct had

violated his Sixth Amendment right to confrontation. *Id.*, at 543. The Sixth Circuit

explained, "[w]ere we to hold that petitioner fairly presented his Confrontation Clause

claim to the state courts on direct review, state courts would be compelled to consider

*sua sponte* all possible federal legal claims that a petitioner's factual allegations might

arguably support." *Id.*, at 556. *See also Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir.

1987) ("If the difference between these contentions is a difference in legal theory,

Prather did not exhaust his claim in the state courts"); *Jamison v. Collins*, 100 F. Supp.

2d 521, 550 (S.D. Ohio 1998) (finding that claim challenging identification evidence was

not fairly presented in claim of ineffective assistance of trial counsel for the failure to

object to that identification evidence) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 374-

75 (1986), and *Carsetti v. State of Maine*, 932 F.2d 1007, 1011 (1st Cir. 1991)).

In determining whether petitioner satisfied the fair presentment requirement, the

Court begins its analysis by comparing the claim that petitioner presented on direct

appeal to the Ohio State Supreme Court and the claim that he seeks to present in

habeas to this Court. In his merit brief on direct appeal, petitioner argued that he was

denied effective assistance of counsel due to counsel's failure to object to the form or

substance of Devillers' testimony. Specifically, petitioner argued:

> At trial, the State introduced, in its case in chief, the testimony of
> David Devillers, a former Franklin County assistant prosecutor who had
> worked on the investigation of the deaths of the two victims. At the time of
> his testimony, Devillers was employed by the federal government as an
> assistant United States Attorney. (T. 794). The State desired to call
> Devillers to refute the existence of any "secret deals" between the State
> and Shannon Boyd, the State's star eyewitness. (T. 791). The State
> argued that, during his cross examination of Mr. Boyd the previous day,
> Appellant's counsel had suggested that Mr. Boyd had some type of
> "secret deal" with the State. Defense counsel objected to Devillers'

75

testimony on two grounds: first, that the State had not provided his name during pretrial discovery, (a fact that the State conceded) and second that his testimony would be in the nature of rebuttal and therefore procedurally improper. (T. 790). The trial court overruled both objections, and allowed Devillers to testify as a "fact witness." (T. 792). Devillers' testimony revealed that he had negotiated a plea agreement with Shannon Boyd in which Boyd would testify against the Appellant in exchange for the privilege of pleading guilty to two counts of involuntary manslaughter. (T. 794-7). But Devillers became much more than a fact witness. He became an expert witness for the State, explaining the new sentencing law; (T. 797-8); how the parole laws functioned (T. 797, 801); the difference between manslaughter and murder (T. 803); and how prosecutors come to make plea bargains with folks such as Shannon Boyd (T. 797-8, 803, 814). Although the State never offered his testimony as that of an expert, his testimony bore all the indicia of an expert's. Appellant's counsel did not object to the form or substance of Devillers' testimony.

In not doing so, Appellant's counsel did not function as counsel as required by the United States and Ohio Constitutions and applicable case law. Devillers essentially vouched for Shannon Boyd's testimony, opining at several points that it was "truthful." (T. 797; 799; 804; 815). During his discussion of how plea agreements are formed, he testified that a prosecutor and a detective would only consider using an informant's testimony if they believed it to be "truthful." (T. 796; 814). Therefore, the jury would have concluded that Devillers found Boyd to be truthful, since he agreed to plea bargain with Boyd in exchange for his testimony.

That type of opinion testimony is clearly prohibited. In State v. Boston (1989), 46 Ohio St. 3d 108, this Court prohibited the opinion testimony of medical experts, to the extent that those experts opined that a child's statements concerning sexual abuse were true. Boston, at 128. In fact, this Court's opinion states that: "We have little difficulty in finding that the admission of this testimony was not only improper -- it was egregious, prejudicial and constitutes reversible error." The opinion went on to cite Justice Brown's concurring opinion in State v. Eastham (1988), 39 Ohio St. 3d 307. In Eastham, the State called a school counselor, who testified that it was his opinion that his counselee was being truthful when she described illegal sexual acts committed against her by Eastham. Justice Brown stated that the counselor's testimony "acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility...In our system of justice it is the fact finder, not the so-called expert or lay witness, who bears the burden of assessing the credibility and veracity of witnesses." Eastham, supra at 312.

During Devillers' testimony, Appellant's counsel offered not one objection to his bolstering of and vouching for the testimony of the State's lone eyewitness to the homicides.  No wonder that the jury found Boyd's testimony so believable.  Any doubt they might have had was washed away by the egregious, prejudicial and erroneous testimony of the State's own lawyer.  In this episode, Appellant's counsel failed to act effectively in preventing this clear and palpable violation of Appellant's Constitutional right to a fair trial.

In order to establish a claim of ineffective assistance of counsel, Appellant must satisfy a two-pronged test.  Strickland v. Washington (1984), 466 U.S. 668.  First, Appellant must show that his counsel was "objectively deficient" or acted unreasonably.  State v. White (1998), 82 Ohio st. 3d 16.  Second, Appellant must show that but for counsel's errors, a reasonable probability exists that the result of the trial would have been different.  White, supra.  In the instant case, the State built its attack on the Appellant around the testimony of an informant: Shannon Boyd.  Defense counsel then allowed the State to vouch for the testimony of its own witness through the imprimatur of the former Assistant Prosecuting Attorney who had put the deal together.  Despite the clear prohibition of that technique, defense counsel did not object.  Given the dubious nature of Boyd's testimony, the jury would have been less likely to have believed him without the blessing bestowed upon him by the State's witness.

Defense counsel were clearly ineffective in not objecting to Mr. Devillers' testimony and Appellant's convictions should be reversed and he should be granted a new trial.

(App. Vol. 4, at 70-73.)

The Ohio Supreme Court rejected petitioner's claim, ultimately concluding that

counsel were not ineffective for failing to object to certain aspects of Devillers'

testimony.  The Ohio Supreme Court began its analysis of petitioner's claim by setting

forth the two-part *Strickland* test for reviewing claims of ineffective assistance of

counsel, and then stated:

In proposition I, Monroe contends that counsel were deficient in failing to object to the form and substance of the testimony of David Devillers, the former prosecutor who negotiated the plea agreement with state's witness Shannon Boyd.

77

Monroe concedes that defense counsel objected to Devillers' testimony on two grounds before Devillers took the stand: first, that the state had not listed him as a potential witness, and second, that his testimony would be in the nature of rebuttal and therefore procedurally improper unless Devillers were called after the defense's case.

The trial court overruled the defense's objections and permitted Devillers to testify as a "fact witness." The state had proposed Devillers as a late prosecution witness to refute the defense's assertion during opening statement that the police and prosecutor had "manufactured" evidence. Moreover, the state wanted to refute defense counsel's suggestion (during cross-examination of Boyd) that a secret deal had been made between the state and Boyd concerning the length of his sentence. Defense counsel specifically raised Devillers's name as the person who had worked out the plea bargain.

Monroe claims that Devillers testified that he believed Boyd had given truthful information in exchange for a plea deal. Monroe asserts that his counsel should have objected to this testimony, which he claims vouched for Boyd's testimony. Monroe contends that allowing Devillers's was contrary to our holding in State v. Boston (1989), 46 Ohio St. 3d 108, 128-129, 545 N.E. 2d 1220 (a child-molestation case in which we reversed the conviction because an expert witness had given her opinion as to the veracity of the child declarant).

In this case, however, Devillers did not testify that he believed that Boyd had testified truthfully. Rather, he explained what had happened during the plea-bargaining process with Boyd. Devillers explained that prosecutors will not make a deal with a witness unless they conclude that the witness is telling the truth. While Devillers testified that he had agreed to the plea bargain with Boyd because he believed that Boyd was being truthful, he did not vouch for the truthfulness of Boyd's testimony. Rather, Devillers noted that the determination whether Boyd was giving truthful testimony was "completely up to the jury."

Through Devillers's testimony, the prosecution sought to establish that the state and police had not manufactured evidence and that there was no "secret deal" made with Boyd. Similar to the situation we faced in State v. Jackson (2001), 92 Ohio St. 3d 436, 449, 2001 Ohio 1266, 751 N.E. 2d 946, the prosecutor here established that there was a plea agreement with the witness, and as part of that agreement, the witness had agreed to tell the truth. See, also, State v. Williams (1997), 79 Ohio St. 3d 1, 12-13, 1997 Ohio 407, 679 N.E. 2d 646. Even if part of Devillers's testimony was improper, any error did not affect the outcome of Monroe's trial, especially in view of the abundant evidence of Monroe's

guilt. Therefore, counsel were not ineffective for failing to object to certain aspects of Devillers's testimony.

Monroe asserts that although the state never offered Devillers as an expert witness, his testimony bore all the indicia of expert testimony, since it explained the new criminal-sentencing law, the parole laws, the difference between murder and manslaughter, and how prosecutors make plea bargains. Monroe contends that it was improper to allow Devillers to testify, in effect, as an expert witness, since the trial court did not formally qualify him as such.

Monroe concedes that the state did not offer Devillers as an expert witness and that the trial court allowed his testimony as a "fact witness." Even if we were to view Devillers as an expert witness not formally qualified by the trial court, it is clear that Devillers's knowledge of criminal law and of the facts and circumstances of Boyd's plea bargain is not knowledge possessed by the average lay person. Thus, Devillers was qualified to testify as an expert on such matters under Evid.R. 702, even though the court did not formally qualify him as one. See State v. Baston (1999), 85 Ohio St. 3d 418, 423, 1999 Ohio 280, 709 N.E. 2d 128.

*Monroe*, 105 Ohio St. 3d at 399-400; App. Vol. 4, at 302-303.

In this Court, petitioner argues that he was deprived of due process and a fair

trial by the ongoing misconduct of the prosecuting attorney in violation of the Fifth,

Sixth, Eighth, and Fourteenth Amendments, due in part to the state introducing during

its case in chief the testimony of David Devillers. Specifically, petitioner argues:

At the trial phase, the state introduced, in its case in chief, the testimony of David Devillers, a former Franklin County Assistant Prosecuting Attorney, who had formerly been the lead prosecutor involved in investigating and prosecuting the murders of these two victims. At the time of his testimony, Devillers had left the employ of the Franklin County Prosecuting Attorneys' Office to become an Assistant United States Attorney in the Southern District of Ohio. (Tr. 794).

The trial prosecutors called their former colleague -- Devillers -- purportedly to refute the existence of any "secret deals" between the state and the state's star witness, co-defendant Shannon Boyd, (Tr. 791), arguing that, during cross examination Monroe's counsel had imputed the existence of a "secret deal."

Counsel for Monroe objected to Devillers' testimony. (Tr. 790).

The trial court overruled permitted (sic) Devillers to testify as a "fact witness." (Tr. 792).

Devillers testified that he had negotiated a plea agreement with Shannon Boyd. The plea agreement, according to Devillers, was limited to Boyd testifying truthfully against Monroe in exchange for being permitted to plead guilty to the lesser charges of two counts of involuntary manslaughter. (Tr. 794-7).

Devillers, however, became more than a fact witness, he became an expert witness for the state, explaining Ohio's new sentencing law; (Tr. 797-8); the functioning of Ohio's parole system (Tr. 797, 801); the legal differences between involuntary manslaughter and aggravated murder (Tr. 803); and how and why prosecutors agree to enter into plea agreements with criminals such as Shannon Boyd (Tr. 797-8, 803; 814). Although the state never attempted to qualify Devillers as an expert in any of these fields, his testimony bore all the indicia of expert testimony.

Most critically, Devillers was permitted to vouch for Shannon Boyd's truthfulness, opining at several points that Boyd's testimony was "truthful." (Tr. 797; 799; 804; 815).

During his testimony about how plea agreements were reached, Devillers testified that a prosecutor and a detective would only consider using an informant's testimony if they believe it to be "truthful." (Tr. 796; 814).

The only conclusion that could be drawn -- and that could have been intended -- from this testimony was that Devillers (and the Franklin County Prosecutors Office where he was employed at the time of these negotiations) believed Boyd to be telling the truth, since (and the Prosecutor's office) agreed to enter into this plea agreement with Boyd in exchange for his testimony against Monroe. This conclusion was verified by the fact that the prosecutors trying the case had called Boyd as a witness.

It is clearly improper for a prosecuting attorney to vouch for the truthfulness of any state's witness. It is no less improper for the state to call a former assistant prosecuting attorney to explain that the same prosecuting attorneys office was willing to enter into a plea agreement because they believed the witness to be truthful -- especially where the testifying former prosecutor had negotiated the agreement while prosecuting the case in trial.

This is no different from the prosecuting attorney trying the case emphasizing in closing argument -- or otherwise -- that he or she believed Shannon Boyd to be telling the truth.

That type of opinion testimony -- vouching for the truthfulness of any witness including a snitching co-defendant -- is clearly prohibited.

This is no different from permitting expert medical testimony that a child sexual abuse witness is telling the truth. The state cannot be permitted to bring in through the back door the testimony of a former assistant prosecuting attorney -- who prepared the case being tried -- that the witness is being truthful in his opinion, what it is prohibited from commenting on in any other form.

The introduction of Devillers' testimony about the truthfulness of Shannon Boyd infringed upon the primary role of the jury as fact finder -- that is making determinations of veracity and credibility. It is the jury and not any witness -- whether qualified as an expert or not -- that ultimately bears the burden of assessing the credibility and veracity of witnesses.

The state's presentation of Devillers' testimony clearly infringed upon the jury's obligation to determine the veracity and credibility of Shannon Boyd and violated Devillers' ethical obligations. Under Ohio Disciplinary Rule 5-101, it was clearly improper for a member (or former member) of he prosecuting attorney's office to testify about a matter that he had handled. This situation clearly called for the appointment of a special prosecutor once Devillers became a witness.

The introduction of this compelling testimony on the truthfulness of the state's key witness clearly deprived Jonathon Monroe of a fair trial and due process in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Any doubt that the jury may have had about Boyd's truthfulness was washed away by the testimony of the state's own lawyer that the state would only put Boyd on the stand if he was being truthful.

Devillers' testimony was directed at bolstering the shaky credibility of the state's key witness -- co-defendant Shannon Boyd. Devillers' improper vouching for Shannon Boyd had an effect on the jury's assessment of Boyd's credibility. In that Boyd -- who clearly participated in this crime -- had much to gain from pointing the finger at Monroe and away from himself, any factor that bolstered his credibility had an effect on the outcome of the trial.

> Presenting former assistant prosecuting attorney Devillers -- who
> had engineered the plea agreement with Boyd -- to vouch for the
> truthfulness of Boyd was clearly improper, and denied Monroe due
> process and a fair trial.

(Petition, Doc. # 10, at ¶¶ 77-95.)

The Court is constrained to conclude that petitioner did not fairly present the

prosecutorial misconduct allegations set forth in paragraphs 77 through 95 of his first

ground for relief. The weight of Sixth Circuit authority is stacked against him.

It is true that the claims share the same core factual predicate--namely, the

prosecutor presenting the testimony of David Devillers ostensibly to refute the existence

of any secret deals between the State and Shannon Boyd, but ultimately offering

improper opinion testimony about Boyd's truthfulness. But the Sixth Circuit has made

clear that relatedness of the two claims at issue does not necessarily satisfy the fair

presentment requirement. *White v. Mitchell, supra*, 431 F.3d at 526 ("While these two

claims are related to the fact that the ineffective assistance claim is based on the failure

to raise a *Batson* challenge, the two claims are analytically distinct"). It is true that in

rejecting petitioner's claim of trial counsel ineffectiveness, the Ohio Supreme Court

touched upon the propriety of Devillers' testimony under case law concerning improper

opinion testimony. But the Ohio Supreme Court was not required by the manner in

which petitioner presented his claim to do so. And the Sixth Circuit has cautioned

against construing the fair presentment requirement in a manner that would impose

such a requirement on state courts. *See Hicks v. Straub, supra*, 377 F.3d at 556

("Were we to hold that petitioner fairly presented his Confrontation Clause claim to the

state courts on direct review, state courts would be compelled to consider *sua sponte*

82

all possible federal legal claims that a petitioner's factual allegations might arguably support"). Even where the state court's disposition of the claim that was raised appears to require or involve disposition of the federal habeas claim that was not raised, it appears that the Sixth Circuit has declined to find fair presentment. *See Lott v. Coyle, supra,* 261 F.3d at 607 (finding that the petitioner had not fairly presented claim challenging voluntariness of waiver as claim challenging trial court's compliance with statutory requirements for effectuating a valid waiver, even though "the former is a function of the latter"). Thus, federal courts have declined to find fair presentment where, as here, the claim that the petitioner seeks to present for habeas review was presented to the state courts as an instance of ineffective assistance of counsel. *See, e.g., White v. Mitchell, supra,* 431 F.3d at 526 (no fair presentment of *Batson* claim presented only as instance of appellate counsel ineffectiveness); *Jamison v. Collins,* 100 F. Supp. 2d at 550 (no fair presentment of claim challenging identification evidence presented only as instance of trial counsel ineffectiveness).

The trial counsel ineffectiveness claim that petitioner presented to the Ohio Supreme Court and the prosecutorial misconduct claim that petitioner seeks to present to this Court share the same core factual predicate. But the fact remains that the claims are legally and analytically distinct. Because of that, (or as evidence of that), petitioner's expanded focus herein on the prosecutor's conduct and intent in presenting Devillers' testimony was readily apparent. For the foregoing reasons, the Court concludes that petitioner did not fairly present the prosecutorial misconduct allegations set forth in paragraphs 77 through 95 of his first ground for relief.

Because the Court has determined that the prosecutorial misconduct allegations set forth in paragraphs 77 through 95 of petitioner's first ground for relief are waived, this Court cannot review them absent a showing of cause and prejudice. Petitioner offers no cause and prejudice arguments. Logically, the only argument petitioner could offer is ineffective assistance of appellate counsel, and this Court is precluded from considering that argument because it does not appear that petitioner ever presented that appellate counsel ineffectiveness claim to the state courts. *See Edwards v. Carpenter*, 529 U.S. at 452-53 (holding that an ineffective assistance of counsel claim offered as cause for the default of a substantive federal claim must first be properly presented to the state courts). Accordingly, respondent's motion to dismiss paragraphs 77 through 95 of petitioner's first ground for relief is GRANTED.

Notwithstanding the fact that this claim is clearly defaulted, the Court feels compelled to note its concern regarding this issue. The Court differs with the Ohio Supreme Court's distinguishing of Devillers' testimony from run-of-the-mill vouching, which is, for good reason, improper. Further, the Court believes that the prosecutors in this case pushed the boundaries, unnecessarily, by presenting Devillers' testimony concerning his perception as to the truthfulness of Shannon Boyd. In presenting this testimony, the government came perilously close to committing reversible error.

## E. Ground Seven -- Improper "Unanimity" Instructions / Verdict Forms in Penalty Phase

In his seventh ground for relief, petitioner argues that the jury instructions and verdict forms in the penalty phase required the jury to unanimously reject a death

84

sentence before considering any of the life sentence options, depriving petitioner of a fair trial, due process, and a fair and reliable sentencing determination. (Petition, Doc. # 10, at ¶¶ 168-178.) Petitioner argues that although a death sentence verdict must be unanimous, and although a jury that cannot unanimously agree that death is the appropriate sentence must consider the life-sentence options, it is error to instruct the jury that it must unanimously reject the death sentence before considering the life-sentence options. Specifically, petitioner argues that any instruction or verdict form that requires the jury to unanimously reject the death sentence before considering the life-sentence options prevents the jury from giving full consideration to the mitigating evidence presented.

Respondent argues that petitioner defaulted this claim because he never properly presented it to the state courts. "Rather," according to respondent, "on direct appeal, Monroe claimed that the instructions and jury forms erroneously told the jury that 'having reached a *deadlock* on whether or not the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt,' the jury must '*unanimously* recommend' one of the life-sentencing opinions." (Doc. # 19, at 26, (quoting Merit Brief, App. Vol. 4, at 100 (emphasis in original)).)

Petitioner characterizes as misplaced and disingenuous allegations that his claim differs in any substantive manner from the claim that he presented to the Ohio Supreme Court on direct appeal. (Doc. # 27, at 22-26.) Petitioner argues that "[a] comparison of the claims raised in the Supreme Court of Ohio and the claims raised in Monroe's Petition for a Writ of Habeas Corpus demonstrates that not only is the thrust

of the claims the same, but the cases and argument relied on by Monroe are the same." (*Id.*, at 22.) The Court disagrees.

As noted above, in order to satisfy the exhaustion requirement in habeas corpus, a petitioner must fairly present the substance of his constitutional claim to the state courts. *Anderson v. Harless*, 459 U.S. 4, 6, (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Although the fair presentment requirement is a rule of comity, not jurisdiction, *see Castille v. Peoples*, 489 U.S. 346, 349 (1989); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999), it is rooted in principles of comity and federalism designed to allow state courts the opportunity to correct the State's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment. A petitioner fairly presents the "substance of his federal habeas corpus claim" when the state courts are afforded sufficient notice and a fair opportunity to apply controlling legal principles to the facts bearing upon the constitutional claim. *Harless*, 459 U.S. at 6. Although a certain degree of tinkering is permissible, a petitioner does not fairly present a claim if he presents an issue to the state courts under one legal theory and set of facts, and then presents the issue to the federal courts under a different legal theory or a different set of facts. Rather, he must present to the federal court essentially the same facts and legal theories that were considered and rejected by the state courts. *Lorraine v. Coyle*, 291 F.3d at 425 (citing *Wong v. Money*, 142 F.3d at 322); *Lott v. Coyle*, 261 F.3d at 607.

Petitioner argues that "[t]he language contained in Monroe's Petition for a Writ of Habeas Corpus tracks the language of Proposition of Law Nine -- practically

verbatim...." (Doc. # 27, at 24.) But close comparison of the two claims reveals a critical difference between the claim that petitioner raised on direct appeal and the claim that he seeks to raise here.

Petitioner argued to the Ohio Supreme Court in his Ninth Proposition of Law that a jury instruction that requires that a life sentence recommendation be unanimous materially prejudices a capital defendant's right to a fair trial and to be free from deprivation of life without due process of law under the Fourteenth Amendment to the United States Constitution. The entirety of petitioner's argument is set forth below:

> R.C. 2929.03(D)(2) makes clear that a jury's recommendation of death must be unanimous. A recommendation of life need not be unanimous; rather, the jury should recommend life imprisonment if they are anything other than unanimously in favor of death. Thus, the jury must recommend life imprisonment if either; (1) the jurors unanimously agree that a death sentence is inappropriate; or (2) the jurors cannot all agree -- they are split and deadlocked -- on whether the death sentence is appropriate. It is not the law that the jury must be unanimous in its sentence recommendation for life imprisonment. State v. Brook (1996), 75 Ohio St. 3d 148, 162 ("In Ohio, a solitary jur[or] may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors from this point forward should be so instructed."); State v. Springer (1992), 586 N.E. 2d 96, 100 ("In cases where, as here, the jury becomes hopelessly deadlocked during its sentencing deliberations and is unable to unanimously recommend any sentence, including death, the penalty of death is clearly unauthorized and one of two remaining (authorized) sentencing options must be imposed upon the offender by the court.").

> In this case, the trial judge instructed the jury as follows:

>> The second verdict form reads:
>> We, the jury, having reached a deadlock on whether or not the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, hereby unanimously recommend the following life sentence count one (check one):
>> (Id. at 1515) (emphasis added).

The court's instruction is problematic for two reasons. First, it tells the jury that a particular life sentence must be unanimous in violation of the above cited cases. Second, the trial court's instruction uses the term "deadlock", thereby ignoring the possibility that the jury may find unanimously that the aggravating circumstances do not outweigh the mitigation factors beyond all reasonable doubt. By so doing, the trial [court] undermines the value of any mitigation the defense provided and essentially assumes that some jurors will find that death is the appropriate sentence.

Based on the above cases, as well as Mapes v. Coyle 171 F.3d 408 (6th Cir. 1999), Appellant's rights under the Ohio and Federal Constitutions were violated by giving a unanimity instruction during the penalty phase, thereby creating a substantial risk of an erroneous imposition of a death sentence. See Brooks, supra, at 1041.

(App. Vol. 4, at 99-100.)

The Ohio Supreme Court rejected petitioner's claim, albeit reviewing the claim

for only plain error due to the failure of trial counsel to object to the jury instructions or

verdict forms at trial. Specifically, the Ohio Supreme Court determined:

In proposition IX, Monroe contends that he was prejudiced because the second of three verdict forms submitted to the jury for each of the eight aggravated murder counts stated that a life-imprisonment verdict must be unanimous. Monroe asserts that recommendation of a life sentence need not be unanimous and that the jurors should recommend a life sentence if they are anything other than unanimously in favor of a death verdict. Yet Monroe's failure to object at trial waived all but plain error. State v. Underwood (1983), 3 Ohio St. 3d 12, 3 OBR 360, 444 N.E. 2d 1332, syllabus. No plain error occurred.

The second verdict form given to the jury for each of the eight aggravated murder counts provided:

"We, the Jury, having reached a deadlock on whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, hereby unanimously recommend the following life sentences on Count * * * (check one):

\*     \*     \*

88

In State v. Jenkins, 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E. 2d 264, paragraph ten of the syllabus, we held: "In returning a sentence of life imprisonment under R.C. 2929.03(D)(2), the jury's verdict must be unanimous." Thus, contrary to Monroe's assertion, unanimity is indeed required in order for the jury to return a life sentence.

Monroe cites State v. Springer (1992), 63 Ohio St. 3d 167, 586 N.E. 2d 96, and State v. Brooks (1996), 75 Ohio St. 3d 148, 1996 Ohio 134, 661 N.E. 2d 1030, but neither case supports his argument. In Springer, we held that if the jury becomes irreconcilably deadlocked in the penalty phase of a capital trial and is unable to reach a unanimous verdict to recommend any sentence authorized by R.C. 2929.03(C)(2), then the trial court is required to impose a life sentence. Springer at syllabus. In Brooks, we recognized that in Ohio, a solitary juror may prevent a death-penalty recommendation and held that juries from the date of that decision forward should be so instructed. Brooks at 162, 661 N.E. 2d 1030. Yet Brooks also reaffirmed the Jenkins standard that the jury must be unanimous in returning a life verdict. Id. "In Ohio, it is required that a verdict of life imprisonment be unanimous, and that requirement has been upheld as constitutional." State v. Nields, 93 Ohio St. 3d at 30, 752 N.E. 2d 859.

Thus, the second verdict form for each of the aggravated-murder counts accurately reflected Ohio law, and we reject Monroe's argument that a recommendation of a life sentence need not be unanimous.

Monroe, 105 Ohio St. 3d at 393-94; App. Vol. 4, at 298-99.

In this Court, petitioner argues in his seventh ground for relief that the jury

instructions and verdict forms required the jury to unanimously reject a death sentence

before considering any of the life sentence options, depriving Monroe of a fair trial, due

process, and a fair and reliable sentencing determination in violation of the Fifth, Sixth,

Eighth, and Fourteenth Amendments. Specifically, petitioner argues:

Ohio Rev. Code § 2929.03(D)(2) requires that the jury's verdict to impose death must be unanimous.

In the absence of such a unanimous finding, the jury is required to consider which of the alternate life sentences to impose. Ohio Rev. Code § 2929.03(D) ("Absent such a finding, the jury shall recommend that the offender be sentenced to one of the following [life sentences].")

Only the death verdict need be unanimous.  Once the jury determines that it cannot unanimously agree that death is the appropriate sentence, the jury just consider the life sentences.

Any instruction that requires the jury to unanimously reject the sentence of death before considering the life sentences prevents the jury from giving full consideration to the mitigating evidence presented (or that should have been presented) in violation of long established principles requiring the sentencer to be afforded the opportunity to give full weight to all mitigating evidence proposed by the defendant.

Under Ohio law the jury must return one of the life verdicts if they cannot unanimously agree on a sentence of death.

The jury must return a verdict imposing one of the life sentences if either; (1) the jurors unanimously agree that a death sentence is inappropriate; or (2) the jurors cannot all agree -- they are split and deadlocked -- on whether the death sentence is appropriate.

The jury may not be instructed under Ohio law that it must unanimously reject death before considering a life sentence.

The instructions misled the jury about the power of one juror to prevent a sentence of death and prevented individual jurors from giving full weight to the mitigating circumstances presented by Monroe at the penalty phase, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

To the extent the extent that trial counsel failed to object to the trial court's failure to give appropriate instructions on the jury's role at the penalty phase, counsel's performance fell far below the prevailing professional norms for counsel in a capital case in 2002, thus depriving Monroe of the effective assistance of counsel.

The merits decision of the Ohio courts on Monroe's claims was contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state courts.  28 U.S.C. § 2254(D).

(Petition, Doc. # 10, at ¶¶ 168-178.)

A comparison between the ninth proposition of law that petitioner presented to

the Supreme Court of Ohio and the seventh ground for relief that petitioner seeks to

present here reveals a critical difference between the two. Here, petitioner seeks to argue that the trial court erred in instructing the jury that it had to unanimously reject the death penalty in order to consider the life sentence options. "The jury may not be instructed under Ohio law that it must unanimously reject death before considering a life sentence." (Petition, Doc. # 10, at ¶ 175.) On appeal to the Ohio Supreme Court, petitioner appeared to concede that the trial court had not given an instruction requiring the jury to unanimously rule out the death penalty. Instead, petitioner raised a claim challenging the trial court's instruction requiring any life sentence recommended by the jury to be unanimous. "It is not the law that the jury must be unanimous in its sentence recommendation for life imprisonment." (App. Vol. 4, at 99.) In other words, the claim that petitioner raised on direct appeal to the Ohio Supreme Court focused on a unanimity requirement for the life sentences, not a unanimity requirement for the decision to rule out death. Those claims are distinctly different, even if they implicate similar principles and rely on the same cases. Accordingly, the Court concludes that petitioner did not fairly present the jury instruction challenge set forth in his seventh ground for relief.

Because the Court has determined petitioner waived ground seven, this Court cannot review that claim absent a showing of cause and prejudice. Petitioner offers no cause and prejudice arguments. Logically, the only argument that petitioner could offer is ineffective assistance of appellate counsel, and this Court is precluded from considering that argument because it does not appear that petitioner ever presented that appellate counsel ineffectiveness claim to the state courts. See Edwards v. Carpenter, 529 U.S. at 452-53 (holding that an ineffective assistance of counsel claim

91

offered as cause for the default of a substantive federal claim must first be properly presented to the state courts).  Thus, petitioner's seventh ground for relief appears to be waived.

To the extent this claim might have been subject to procedural default due to petitioner's apparent failure to register a contemporaneous objection at trial, respondent did not raise this argument and this court can, but will not, raise it for him.  As a general rule, procedural default is an affirmative defense that must be raised by the state at the first possible opportunity, or it will be waived. *Trest v. Cain*, 522 U.S. 87, 89 (1997) (holding that state's failure to raise procedural default normally constitutes waiver of the default); *Gray v. Netherland*, 518 U.S. 152, 166 (1996) (holding that procedural default is normally an affirmative defense that will be waived if not raised).  Although federal courts are not required to raise procedural default *sua sponte*, *Trest v. Cain, supra*, 522 U.S. at 89, neither are they precluded from raising or recognizing a procedural default that was not expressly raised by the state.  In determining whether to raise procedural default *sua sponte*, however, the Court must consider whether petitioner has been given the opportunity to respond to the procedural default or would otherwise be disadvantaged. *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005) (citing *Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000).  In the instant case, the procedural default defense that respondent raised, (violation of the fair presentment requirement) differs considerably from any procedural default stemming from a violation of Ohio's contemporaneous objection rule.  Notwithstanding the general challenges that petitioner raised to the viability of Ohio's

contemporaneous objection rule, (Doc. # 27, at 28-38), none of the specific arguments that petitioner raised in his memorandum in opposition asserting that he fairly presented his seventh ground for relief translate into arguments that he might raise to challenge an alleged violation of Ohio's contemporaneous objection rule. Thus, this Court is of the view that it would be unfair to *sua sponte* raise for respondent an affirmative defense that was fairly obvious from the record.

For the foregoing reasons, respondent's motion to dismiss petitioner's seventh ground for relief is GRANTED.

## V. Conclusion

For the foregoing reasons, respondent's motion to dismiss procedurally defaulted claims (Doc. # 19), is GRANTED as to the fourth, sixth, sub-part (A) of the eighth, first, and seventh grounds for relief.

In accordance with this Court's *First Scheduling Order* (Doc. # 12), petitioner is DIRECTED, within thirty (30) days of the date of this order, to FILE any motion for discovery. Respondent shall have thirty (30) days from the date that any motion for discovery is filed to file a memorandum in opposition. Petitioner shall have fifteen (15) days from the date that any memorandum in opposition is filed to file a reply.

**IT IS SO ORDERED.**

_____
**Michael H. Watson, Judge**
**United States District Court**